IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 9, 2014 Session

## BRENDA BENZ-ELLIOTT v. BARRETT ENTERPRISES, LP ET AL.

**Appeal by Permission from the Court of Appeals, Middle Section**
**Chancery Court for Rutherford County**
**No. 081355CV     John D. Wootten, Jr., Judge, sitting by interchange**

---

**No. M2013-00270-SC-R11-CV - Filed January 23, 2015**

---

We granted permission to appeal to clarify the analysis that should be used to determine the applicable statute of limitations when a complaint alleges more than one claim. We hold that a court must identify the gravamen of each claim alleged to determine the applicable statute of limitations. Identifying the gravamen of a claim requires a court to consider both the legal basis of the claim and the injury for which damages are sought. Here, the plaintiff contracted to sell the defendants real property in Rutherford County. The contract provided that the plaintiff would retain ownership of a sixty-foot wide strip of property along Interstate 24 to provide access to her remaining property. The contract also provided that its covenants would survive the closing. The warranty deed failed to include the sixty-foot reservation required by the contract. The plaintiff sued the defendants, alleging claims of breach of contract, intentional misrepresentation, and negligent misrepresentation. The defendants raised several defenses, including the statute of limitations. The trial court dismissed the plaintiff's intentional and negligent misrepresentation claims but ruled for the plaintiff on the breach of contract claim and awarded her $650,000 in damages for the diminution in value of her remaining property due to the lack of the contractually guaranteed access route. The defendants appealed, raising six issues, including an assertion that the plaintiff's claim is barred by the statute of limitations. The Court of Appeals, focusing almost exclusively on the type of damages awarded, concluded that the gravamen of the plaintiff's prevailing claim is injury to real property, and as a result, held that the claim is barred by the three-year statute of limitations applicable to "[a]ctions for injuries to personal or real property." Tenn. Code Ann. § 28-3-105(1) (2000 & Supp. 2014). We disagree with the Court of Appeals' conclusions and hold that the gravamen of the plaintiff's prevailing claim is breach of contract, to which the six-year statute of limitations for "[a]ctions on contracts not otherwise expressly provided for" applies. Id. § 28-3-109(a)(3) (2000). Because the plaintiff's claim is not barred by the statute of limitations, we reverse the judgment of the Court of Appeals

and remand this matter to the intermediate appellate court for resolution of the other issues the defendants raised on appeal.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Case Remanded to the Court of Appeals**

CORNELIA A. CLARK, delivered the opinion of the Court, in which SHARON G. LEE, C.J., and GARY R. WADE, and JEFFREY S. BIVINS, JJ., joined. HOLLY M. KIRBY, J., not participating.

G. Sumner R. Bouldin, Jr., Murfreesboro, Tennessee, for the appellant, Brenda Benz-Elliott.

Peter V. Hall, Murfreesboro, Tennessee, for the appellees, Barrett Enterprises, LP and Ronnie Barrett.

**OPINION**

### I. Factual and Procedural History

#### A. Trial Proof

The facts relevant to the dispositive issue in this appeal are not in dispute.[1] The plaintiff, Brenda Benz-Elliott ("Ms. Elliott"), owned about ninety-one acres of real property located between Interstate 24 ("I–24") and Manchester Pike in Rutherford County. One of the defendants, Barrett Enterprises, LP ("BE"), a firearms manufacturing business, owned four acres adjacent to Ms. Elliott's property. BE's property was located on Miller Lane, a frontage road running along I–24. Miller Lane also provided access to Ms. Elliott's property but terminated "somewhere around" her property line.

The other defendant, Ronnie Barrett ("Mr. Barrett"), was the general partner of BE. Mr. Barrett and Ms. Elliott had known each other for about twenty-five years.[2] In 2004, Mr. Barrett approached Ms. Elliott about purchasing a portion of her property, which he needed to expand BE's firearms manufacturing business. Ms. Elliott initially refused to sell;

---

[1] The parties state in their supplemental briefs that the Court of Appeals' opinion accurately recites the facts.

[2] Ms. Elliott's late ex-husband, Stan Benz, had been a partner of Mr. Barrett's in BE at one time. Ms. Elliott lost touch with Mr. Barrett after she and Mr. Benz divorced. Ms. Elliott had obtained the Rutherford County property as part of her divorce settlement.

however, she changed her mind when Mr. Barrett told her to "name [her] price" and agreed to sell him a little more than five acres at $82,500 per acre.

After obtaining Ms. Elliott's agreement to sell, Mr. Barrett contacted the Tennessee Department of Transportation ("TDOT") concerning a proposal to move the existing I–24 right-of-way fence so that Miller Lane could be extended in a straight-line fashion to a point near what would become the boundary line of Ms. Elliott's remaining property after the sale closed. Meanwhile, Mr. Barrett and Ms. Elliott continued working to finalize the terms of a contract that would memorialize their agreement. At the suggestion of Ms. Elliott's attorney, the following provision was added to the contract to ensure that Ms. Elliott retained access to her remaining property after the deal closed.

> **CONDITIONS:** Seller to reserve ownership of a sixty feet (60') wide strip along I–24 for extension of Miller Road to connect remaining Seller's property. Buyer agrees to extend Miller Road built to county specifications along I–24 to a point ten (10) feet south of his new south property line.

Other provisions of the final contract detailed the parties' obligations as to the closing. For instance, the contract obligated Ms. Elliott to arrange and pay for a survey of the property and to engage an attorney to prepare the warranty deed and to conduct the closing. The contract also expressly provided that its covenants would survive the closing.

Mr. Barrett and Ms. Elliott signed the contract on August 5, 2004. After doing so, the parties continued to meet with and speak to officials from TDOT and other governmental agencies regarding the proposed relocation of the I–24 right-of-way fence and the straight-line extension of Miller Lane. After attending earlier meetings in which the extension of Miller Lane was discussed, in February of 2005, Cecil C. Elliott, Ms. Elliott's husband, wrote a letter to TDOT stating that the parties had met with various county and state officials and requesting authorization to move the right-of-way fence. Paul Degges, a TDOT civil engineer, responded by the following letter:

> Thank you for your letter concerning our recent meeting to discuss the possible relocation of the right[-]of[-]way fence along I–24 and the Miller Lane frontage road in Rutherford County. I was glad to read of the support that you have garnered for the expansion of [BE] and the extension of Miller Lane.
>
> As we discussed, [TDOT] is in support of this economic development for the local area, although this is contingent on [TDOT] agreeing to relocate

our fence in order to accommodate the extension of the county right[-]of[-]way for Miller Lane, the existing frontage road.

When formal plans are available, we will allow the relocation of the fence to a point to be determined by [TDOT]. Also, as you stated, this agreement in no way binds [TDOT] to any financial responsibility as regards to the future project.

We look forward to working with all parties as this project becomes more fully developed.

Based on Mr. Degges's letter, Mr. Barrett began obtaining the permits necessary for the expansion of BE's facilities. He also made arrangements to obtain the documents necessary for closing the land sale with Ms. Elliott. Although the August 5, 2004 contract obligated Ms. Elliott to arrange and pay for the property survey, to engage an attorney to prepare the warranty deed, and to conduct the closing, Mr. Barrett actually undertook these obligations. Ms. Elliott did not know a land surveyor, so she agreed to allow Mr. Barrett to choose the surveyor. Additionally, Ms. Elliott agreed with Mr. Barrett's suggestion to use a single lawyer for the closing to minimize costs. Mr. Barrett engaged attorney Jeff Reed, who had represented Mr. Barrett and BE in other matters, to prepare the warranty deed, draft the closing documents, and conduct the closing.

The property transfer closed on March 25, 2005. On the same day, the parties executed a written agreement amending certain provisions of the sale contract.[3] The parties did not revise or amend in any way the contractual provision requiring the reservation to Ms. Elliott of a sixty-foot wide strip of property along I–24 by which she could access her remaining property. Nevertheless, the warranty deed failed to include the contractually required reservation.

After the closing, Mr. Barrett, with the help of Mr. and Ms. Elliott, continued negotiations with TDOT and other governmental entities on the proposal to relocate the I–24 right-of-way fence and extend Miller Lane in a straight-line fashion along the right-of-way. In late 2005 or early 2006, Mr. Barrett began construction on the expansion of BE's manufacturing facilities. Meanwhile, in June 2006, TDOT forwarded Mr. Barrett a letter and a plan for extending Miller Lane, which TDOT characterized as meeting "both your need to accommodate truck traffic to your new facility and our need to preserve the integrity of the interstate right[-]of[-]way." TDOT's plan did not involve a straight-line extension of Miller

---

[3] The written agreement to amend was required by the August 5, 2004 contract, which stated that "[a]ny notice or amendments to this Contract shall be in writing . . . ."

-4-

Lane, which Mr. Barrett and Ms. Elliott agreed would be most beneficial to their properties. Rather, the TDOT proposal consisted of what the parties referred to as a "dog-leg" extension, including a curve of Miller Lane. The TDOT plan would have required relocation of just a short portion of the I–24 right-of-way fence. By the time of receipt, the TDOT plan was unacceptable to Mr. Barrett because it called for extending Miller Lane into an area where detention ponds had already been constructed as part of BE's expanded new facility.[4]

In late November or December 2007, Ms. Elliott became concerned about the ongoing lack of an access road to her remaining property along I–24.[5] She consulted her attorney, who had initially suggested including the reservation provision in the contract, and he advised that the warranty deed transferring the property to Mr. Barrett did not include the reservation required by the contract.

On September 22, 2008, Ms. Elliott filed suit against BE and Mr. Barrett. She amended her complaint on October 21, 2008. Ms. Elliott alleged claims for breach of contract, intentional misrepresentation, and negligent misrepresentation, and she requested specific performance and money damages. BE and Mr. Barrett filed an answer to the amended complaint, and pursuant to an agreed order, later amended their answer to raise six affirmative defenses, including the three-year statute of limitations provided in Tennessee Code Annotated section 28-3-105.

At the bench trial in October 2010, Ms. Elliott testified that she had not agreed to dispense with her contractual right to retain ownership of a sixty-foot wide strip of property, and she denied that the contract provision was discussed at the closing. Ms. Elliott agreed that "a number of discussions about different scenarios [and] different routes" for extending Miller Lane occurred after the closing. She also acknowledged that she and her husband had assisted Mr. Barrett in trying to convince TDOT to move the I–24 right-of-way fence to allow for a straight-line extension of Miller Lane, explaining that such an extension "would have been mutually beneficial to both of us, and it would have enhanced my property and made it worth more." Nevertheless, Ms. Elliott denied ever agreeing to give up her contractual right to a sixty-foot reservation in the event Miller Lane were actually extended along the right-of-way. Ms. Elliott conceded that she did not review the warranty deed at the

_____

[4] Mr. Barrett testified that TDOT countered with several alternative plans, including a proposal to access Ms. Elliott's remaining property from the northeast side of his property. Mr. Barrett testified that this proposal would have been more expensive than the straight-line extension and was not acceptable to Ms. Elliott.

[5] Ms. Elliott retained access to her property by way of Manchester Pike.

closing but insisted that she would not have understood the metes and bounds description even if she had reviewed the document.

In contrast, Mr. Barrett testified that the parties did not close on the sale "until [they] had assurances and an agreement from TDOT that [the desired extension of Miller Lane] was going to occur." Mr. Barrett stated that he would not have proceeded with the sale if the contractual sixty-foot reservation had remained the only means of affording Ms. Elliott access to her remaining property. Mr. Barrett testified that, in signing the contract and constructing the new BE facility, he had relied upon Ms. Elliott's silence concerning the sixty-foot reservation and her lack of objections at closing.

Mr. Reed, the attorney who prepared the warranty deed and conducted the closing, testified that, when he asked Mr. Barrett about the parties' intentions concerning the sixty-foot reservation prior to closing, Mr. Barrett informed him that TDOT had agreed to the parties' proposal to extend Miller Lane along the I–24 right-of-way, making it unnecessary to include the reservation in the warranty deed. Mr. Reed testified that he remembered presenting the warranty deed to the parties at closing and receiving assurances that they had an arrangement with TDOT to use the I–24 right-of-way for the access road.

Mr. Degges, the TDOT civil engineer, testified that TDOT never agreed to move the right-of-way fence to allow for a straight-line extension of Miller Lane along the right-of-way. According to Mr. Degges, he explained to Mr. Barrett and Mr. Elliott at an initial meeting with them in January 2005, that he "didn't feel that [TDOT] could allow the extension of the road on the interstate right-of-way, but [he] did feel there would be an opportunity for [TDOT] to help partner with Rutherford County" to "build a public road [and] provide that access adjacent to the interstate." Mr. Degges agreed that the parties "discussed an alternative proposal whereby just a little corner of the right-of-way fence would be removed." Mr. Degges stated:

> In the discussion we talked about offsetting the road so it wouldn't be on I–24 right-of-way-proper. And Mr. Barrett and Mr. Elliott were concerned about getting [eighteen]–wheeler traffic in through here. So we kind of sketched out and, kind of, talked about, to be able to make that turn, that as transportation engineers we would be able to design a road to be able to make those types of turns; and, if necessary, I felt that I might be able to cut a corner off of the fence if I had to. But I just—we just didn't feel that we could build the road down the right-of-way. So the discussion of moving the fence had to do with the cutting the corner off of the fence.

-6-

Mr. Degges testified that, although TDOT sent a letter and a drawing to Mr. Barrett and Mr. Elliott describing the general concept that it was willing to approve, Mr. Barrett consistently returned to the straight-line extension of Miller Lane down the I–24 right-of-way. Mr. Degges recalled repeatedly telling Mr. Barrett that extending Miller Lane along the right-of-way was not going to be possible, and he testified that TDOT never agreed to Mr. Barrett's proposed straight-line extension of Miller Lane.

With respect to damages, Ms. Elliott presented the testimony of Russell Parrish, a licensed real estate appraiser. Mr. Parrish opined that "the highest and best use" of Ms. Elliot's property "was commercial/industrial development." Based on this use, Mr. Parrish appraised Ms. Elliott's remaining eighty-six acres at $5,332,000 in March 2005, before the closing occurred, and at $3,956,000 after the property sold, reflecting a diminution in value of $1,376,000 or 25.8%. Mr. Parrish "determined that the total diminution was due to the loss of access."

Johnny Sullivan, a real estate appraiser who testified on behalf of the defendants, stated that about thirteen and a half acres of Ms. Elliott's remaining property were zoned commercial at the time of the sale, with the remaining acreage zoned agricultural or residential. Mr. Sullivan assessed the total value of Ms. Elliott's remaining acreage at $1,404,000 at the time of the sale in March 2005 and at $1,305,000 after the sale, reflecting a diminution in value of $99,000 from the lack of the contractual access along I–24.

### B. Trial Court's Ruling

At the conclusion of the proof, the trial judge dismissed Ms. Elliott's claims of intentional and negligent misrepresentation, finding that Ms. Elliott had failed to prove these claims. The trial court found that Ms. Elliott had carried her burden of proof on the breach of contract claim. With respect to that claim, the trial judge made the following findings:

> Now, come March of 2005, what I see is a closing, a presentation of a deed, based upon the metes and bounds description, but there was no survey there. And indeed I note particularly that Mr. Reed said that he presented the deed . . . , but he didn't go over that [the metes and bounds] in particular . . . .

> Now, let's go to the next cause of action, under the breach of contract theory. Has the Plaintiff carried her burden of proof with regard to a breach of contract? I said earlier, to me, the gist of this contract, first just to sell the property but also there's specific therein a reservation of ownership of sixty feet. The contract also says that anything having to do with an alteration or modification has to be in writing. One thing [written modification] was

-7-

done—it had to do with taxes, but one thing was done. The rest of this has to do with contract—or conversations about the best results that this road might be configured after the contract was signed or even after the closing; and it was all dependent upon third parties, particularly the State of Tennessee . . . . The key document in this case is the contract. As I said earlier, I think it's clear.

Now, is there a breach of contract? Well, there is no road. No road has been built. Number two, there is no reservation of [sixty] feet. So, yes, there is a breach of contract. I find specifically that the Plaintiff has carried her burden of proof in that regard.

The trial court determined that the defendants had failed to establish the defenses of estoppel, waiver, laches, statute of limitations, and modified comparative fault.

Although the trial court ruled for Ms. Elliott on her breach of contract claim, it declined to order specific performance, explaining that a detention pond had already been constructed as part of the BE expansion in the area where TDOT proposed to locate the extension of Miller Lane. The trial court instead awarded Ms. Elliott $850,000 in damages for the diminution in value of her remaining property resulting from the lack of an access road adjacent to I–24.

### C. Hearing on Post-Judgment Facts

The defendants appealed, but before the appeal was resolved, the defendants filed in the Court of Appeals a motion to consider as post-judgment facts that Ms. Elliott had been afforded access to her property via Miller Lane since the trial court ruled. According to the defendants, this access rendered her appeal moot. The Court of Appeals granted the defendants' motion and remanded the case to the trial court for further findings in light of the post-judgment facts.

At the November 1, 2012 hearing on remand, maps were introduced into evidence showing that Miller Lane had been relocated behind BE's property and extended to the southwest corner of Ms. Elliott's property, ending in a cul-de-sac. The Miller Lane extension and access road is not adjacent to I–24; rather, it abuts a portion of Ms. Elliott's property near her home and outbuildings. Testifying at the hearing on remand, Mr. Parrish opined that, in light of the new access road, the diminution in value to Ms. Elliott's remaining property from the lack of ingress and egress along I–24 is $1,066,496. In contrast, Mr. Sullivan testified that, in light of the new access road, Ms. Elliott has sustained no diminution in value of her

remaining property. After hearing the proof, the trial court reduced Ms. Elliott's award for diminution of value by $200,000, resulting in a judgment of $650,000.

### D. Appeal

The defendants again appealed and raised six issues, including the assertion that Ms. Elliott's claim is barred by the three-year statute of limitations applicable to "[a]ctions for injuries to personal or real property." Tenn. Code Ann. § 28-3-105(1).[6] Focusing on the damages awarded for diminution in value of real property, the Court of Appeals held that the gravamen of the claim on which Ms. Elliott prevailed is an action for damages to real property and concluded that her claim is barred by the three-year statute of limitations in section 28-3-105(1). Benz-Elliott v. Barrett Enters., LP, No. M2013-00270-COA-R3-CV, 2013 WL 3958386, at *7 (Tenn. Ct. App. July 29, 2013). Having resolved the appeal on the basis of the statute of limitations, the Court of Appeals did not address the other issues the defendants had raised.[7]

We granted Ms. Elliott's Tennessee Rule of Appellate Procedure 11 application for permission to appeal.

### II. Standard of Review

This appeal requires us to determine which statute of limitations applies to Ms. Elliott's breach of contract claim. This is a question of law, which we review de novo, affording no presumption of correctness to the determination of the courts below. Whaley

---

[6] Ms. Elliott has not appealed from the trial court's dismissal of her intentional and negligent misrepresentation claims and its refusal to order specific performance. Therefore, we do not address any of the statutes of limitations applicable to those claims.

[7] The Court of Appeals pretermitted the following defense issues: (1) the plaintiff's breach of contract claim must fail under principles of waiver or estoppel; (2) the plaintiff was guilty of laches; (3) the trial court erred in holding by implication that the plaintiff's husband was not her agent; (4) the trial court erred in entering an award of damages; and (5) the trial court erred in its award of discretionary costs. Benz-Elliott, 2013 WL 3958386, at *6. Although the defendants did not raise these five issues in their supplemental brief in this Court and instead simply responded to the entirely different issues Ms. Elliott raised in her application for permission to appeal and supplemental brief, the defendants argue that, should this Court reverse the Court of Appeals' decision on the statute of limitations question, this appeal should be remanded to the intermediate appellate court for a determination of the pretermitted issues. In her reply brief, Ms. Elliott opposes a remand and argues that the "facts on all issues presented to the Court of Appeals have been fully developed and are contained in the record on appeal." We conclude that a remand to the intermediate appellate court for determination of the pretermitted issues is appropriate in the context of this case.

v. Perkins, 197 S.W.3d 665, 670 (Tenn. 2006); Gunter v. Lab. Corp. of Am., 121 S.W.3d 636, 638 (Tenn. 2003).

### III. Analysis

#### A. Gravamen: Complaint or Claim?

It is oft-recited law in this State that to determine the governing statute of limitations, a court must ascertain the "'gravamen of the complaint.'" Whaley, 197 S.W.3d at 670 (quoting Gunter, 121 S.W.3d at 638); see also Mike v. Po Group, Inc., 937 S.W.2d 790, 793 (Tenn. 1996); Alexander v. Third Nat'l Bank, 915 S.W.2d 797, 798 (Tenn. 1996); Vance v. Schulder, 547 S.W.2d 927, 931 (Tenn. 1977). However, defining what this principle means has proven difficult over time.

Many Tennessee decisions have explained that ascertaining the gravamen requires a court to determine the basis for which damages are sought. Mike, 937 S.W.2d at 793; Vance, 547 S.W.2d at 931; Swauger v. Haury & Smith Contractors, Inc., 512 S.W.2d 261, 262-63 (Tenn. 1974); Bland v. Smith, 277 S.W.2d 377, 379 (Tenn. 1955); Taylor v. Trans. Aero Corp., 924 S.W.2d 109, 112-13 (Tenn. Ct. App. 1995). However, early decisions of this Court focused exclusively upon the type of injuries for which damages were sought and described the legal basis of the action as "immaterial." Williams v. Thompson, 443 S.W.2d 447, 449 (Tenn. 1969); see also Bland, 277 S.W.2d at 380; Bodne v. Austin, 2 S.W.2d 100, 101 (Tenn. 1928), overruled on other grounds by Teeters v. Currey, 518 S.W.2d 512, 517 (Tenn. 1974).

In Williams, the defendants contracted to sell the plaintiffs a lot and to build the plaintiffs a home on it. 443 S.W.2d at 449. The defendants performed the contract, but after the plaintiffs moved into the home on January 25, 1963, they noticed "cracks in the walls, window and door frames out of alignment, settling of the foundation and sinking of the house into the ground." Id. at 448. The plaintiffs filed suit on July 19, 1968, "alleging a breach of an implied warranty in the contract of sale, dated July 23, 1962, in that defendants did not construct the residence in a good and workmanlike manner." Id. at 449. This Court held that the action was governed by the three-year statute of limitations because the complaint alleged an injury to real property, even though the legal basis of the claim was an alleged breach of an implied warranty in the sale contract. Id. at 449.[8]

---

[8] Were Williams decided today, subsequently enacted statutes of limitations applicable to actions alleging construction defects would apply. Tenn. Code Ann. §§ 28-3-202, -203 (2000).

Even when more than one cause of action was alleged in a single complaint, language in prior decisions of this Court seemed to suggest that the complaint should be distilled to a single "gravaman" based on the type of damages requested. See, e.g., Whaley, 197 S.W.3d at 670 ("The 'applicable statute of limitations . . . will be determined according to the gravamen of the complaint.'" (quoting Gunter, 121 S.W.3d at 638)); Vance, 547 S.W.2d at 931 (same).

More recently we have observed that "gravamen of the complaint" is a "rather elliptical phrase" which "refers to the substantial point, the real purpose, or the object" of an action. Redwing v. Catholic Bishop for the Diocese of Memphis, 363 S.W.3d 436, 457 (Tenn. 2012) (internal quotation marks omitted). We have also said that gravamen is not dependent upon the "designation" or "form" litigants ascribe to an action. Id. (quoting Pera v. Kroger Co., 674 S.W.2d 715, 719 (Tenn. 1984); Callaway v. McMillian, 58 Tenn. 557, 559 (1872)).

But our prior decisions have not specifically discussed the reality that, at least since the adoption of the Tennessee Rules of Civil Procedure, parties may assert alternative claims and defenses and request alternative relief in a single complaint, regardless of the consistency of the claims and defenses. Tenn. R. Civ. P. 8.01, 8.05, 18.01, 18.02; see also Barnes v. Barnes, 193 S.W.3d 495, 501 (Tenn. 2006) ("[A]lternative pleadings are expressly permitted, regardless of consistency . . . ."); Concrete Spaces, Inc. v. Sender, 2 S.W.3d 901, 909 (Tenn. 1999) (explaining that alternative pleadings are permitted). Such alternative claims may well be subject to differing statutes of limitations. An analysis such as that employed in Williams and early decisions would, in fact, be unworkable as it would require a court to identify a single gravamen from a complaint that alleges alternative, and potentially inconsistent, claims. We agree with the Court of Appeals that, in choosing the applicable statute of limitations, courts must ascertain the gravamen of each claim, not the gravamen of the complaint in its entirety. Black v. Sussman, No. M2010-01810-COA-R3-CV, 2011 WL 2410237, at *8 (Tenn. Ct. App. June 9, 2011); Bluff Springs Apartments, Ltd. v. Peoples Bank of the South, No. E2009-01435-COA-R3-CV, 2010 WL 2106210, at *10 (Tenn. Ct. App. May 26, 2010); Mid–South Indus., Inc. v. Martin Mach. & Tool, Inc., 342 S.W.3d 19, 31-32 (Tenn. Ct. App. 2010); Craighead v. BlueCross BlueShield of Tenn., Inc., No. M2007-01697-COA-R10-CV, 2008 WL 3069320, at *8 (Tenn. Ct. App. July 31, 2008); Lewis v. Caputo, No. E1999-01182-COA-R3-CV, 2000 WL 502833, at *4 (Tenn. Ct. App. Apr. 28, 2000); Taylor, 924 S.W.2d at 113.

### B. Test for Ascertaining Gravamen of Each Claim

Having concluded that a court must consider each claim, rather than the entire complaint, when ascertaining gravamen and choosing the applicable statute of limitations,

we next determine the analysis courts should use when undertaking this task. As already noted, although gravamen has long been defined as the basis for which damages are sought, many Tennessee decisions have focused almost exclusively on the damages aspect of this formula and have given little or no consideration to the basis aspect of it. Although not clearly denoted at the time, in Vance v. Schulder, this Court modified the analysis to require consideration of both the *basis of the claim* and the *type of injuries* for which damages are sought. 547 S.W.2d at 932; see also Elizabeth J. Landrigan, The Weakest Link: Application of the Property Damage Statute of Limitation to Tort Claims for Purely Economic Damages, 32 U. Mem. L. Rev. 45, 56 (2001) (describing Vance as enunciating a two-step decisional process).

In Vance, a minority shareholder sued the directors and majority shareholders of a company, alleging that they had intentionally deceived him about the price of the purchase offer for the company and had thereby induced him to sell his stock for half of what he should have received. 547 S.W.2d at 928-29. In determining which of the five possible statutes of limitation applied, the Court first held that the plaintiff's claim was grounded in the tort of deceit. Id. at 931. The Court next determined that the loss in stock value the plaintiff sustained "from the alleged tort of fraud and deceit is included within the phrase, 'injuries to personal property,'" used in the three-year statute of limitations contained in Tennessee Code Annotated section 28-3-105. Id. at 932. Thus, after considering both the basis of the plaintiff's claim and the type of injuries for which recovery was sought, the Vance Court held that the three-year statute of limitations for injury to personal property applied. Id. at 932.

The Court of Appeals applied this same two-step decisional process in Harvest Corp. v. Ernst & Whinney, 610 S.W.2d 727 (Tenn. Ct. App. 1980). There, the plaintiff engaged the defendant to audit the inventory of a plant nursery and to establish a price for the plaintiff's contemplated purchase of the nursery. Id. at 728. Based on the audit report, the plaintiff proceeded with the purchase, only to discover later that the purchase price was excessive because of the audit firm's negligent valuation. Id. The plaintiff sued, alleging, among other things, that the audit firm breached the employment contract, failed to exercise reasonable skill in auditing the inventory, failed to perform the audit in accordance with generally accepted accounting standards, and failed to investigate properly the status of the real property on which the nursery was located. Id. The question on appeal was the applicable statute of limitations. Id. at 729.

Relevant to our discussion here, the Court of Appeals summarized the law in Tennessee as follows:

> Where the damages for which recovery is sought represent the cost of repair or the replacement cost of property entrusted to another for the performance of a service <u>and</u> such accrued damages are the result of negligent acts, the action is for damage to property and covered by [the three-year statute of limitations].

> Likewise, suits for fraud, deceit or conspiracy, whether they arise incident to a contract or not are actions in tort and must be governed by the applicable tort statute of limitations.

<u>Id.</u> at 729-30 (emphasis added) (citations omitted). Because "neither fraud, deceit nor conspiracy" nor any facts "which could possibly constitute such" had been alleged, the Court of Appeals held that the plaintiff's action involved "ordinary money damages that result[ed] from a breach of contract." <u>Id.</u> at 730.

Thus, the Court of Appeals in <u>Harvest Corp.</u> concluded that the purchase of property for more than its full value was not an injury to property, but was a purely economic loss. <u>Id.</u> The <u>Vance</u> Court, in contrast, found that the sale of personal property for less than its full value was an injury to property. Were the focus on damages and injuries alone, the results of these two cases would be irreconcilable because both cases involved financial losses. The differing results are consistent because the legal basis of the claim in <u>Vance</u> was tort, while the legal basis of the claim in <u>Harvest Corp.</u> was breach of contract. <u>See also</u> <u>Resolution Trust Corp. v. Wood</u>, 870 F. Supp. 797, 807 (W.D. Tenn. 1994) (explaining that, when determining the gravamen of a claim, Tennessee law requires courts to consider the cause of the injury, and holding that some claims were governed by the three-year statute of limitations while others were governed by the six-year statute of limitations).

This Court's decision in <u>Alexander v. Third National Bank</u>, further illustrated the two-part <u>Vance</u> analysis and affirmed that the result in <u>Vance</u> stemmed from the tort basis of the claim. In <u>Alexander</u>, the plaintiff, Guy Alexander, had been involved in a partnership that owned an apartment complex. 915 S.W.2d at 798. The apartment complex was encumbered by a deed of trust securing a loan in the approximate amount of $250,000 owed to Sovran Bank. <u>Id.</u> Third National Bank agreed to loan the partnership $650,000, which was to be used to pay off the debts that were secured by the property and to renovate the property. Third National Bank obtained a deed of trust for the $650,000 loan, which was executed but not recorded. <u>Id.</u> Third National Bank then advanced the partnership $350,000, but it refused to provide the remainder of the promised money because the plaintiffs were unable to obtain a release or subordination agreement on one of the debts secured by the property. <u>Id.</u> Third National Bank removed the signature page of the previously executed deed of trust, attached the signature page to a deed of trust securing a $350,000 loan, and recorded the

-13-

altered deed of trust.  Id.  Third National Bank later foreclosed the recorded deed of trust, and the apartments were sold pursuant to the foreclosure.  Id.

Mr. Alexander later sued Third National Bank, alleging claims of "breach of contract, breach of 'implied duty of good faith and fair dealing,' 'fraudulent and/or negligent misrepresentation,' and fraud."  Id.  Mr. Alexander sought to recover as damages:

> additional costs of renovation caused by the delay in obtaining even partial financing from [Third National Bank]; additional interest expense caused by an increase in interest rates; lost rent as a result of the delay in completing renovations; and loss of its equity in the apartments caused by its inability to find substitute financing.

Id.  The trial court granted Third National Bank summary judgment based on the statute of limitations, and the Court of Appeals affirmed, finding that the economic losses the plaintiff sought to recover stemmed from an injury to property, and as such, the three-year statute of limitations of Tennessee Code Annotated section 28-3-105 applied.  Alexander v. Third Nat'l Bank, No. 01-A-01-9310-CV-00452, 1994 WL 424287, at *4 (Tenn. Ct. App. Aug. 12, 1994).

This Court reversed.  Alexander, 915 S.W.2d at 799.  Consistent with Vance, the Alexander Court engaged in a two-step decisional process.  Id.  The Alexander Court first concluded that the legal basis of Mr. Alexander's claim was breach of contract.  Id.  The Court next determined that the damages for which recovery was sought were for "interference with [Mr. Alexander's] anticipated economic gain from the use of the loan proceeds," not for an injury to property.  Id.  These damages, the Alexander Court concluded, flowed from the breach of contract.  Thus, given the basis of the legal claim and the type of injury sustained, the Alexander Court concluded that the six-year statute of limitations for contracts provided in Tennessee Code Annotated section 28-3-109 applied.  Id. at 800.

In so holding, the Alexander Court distinguished Vance, on which Third National Bank relied, pointing out that the claim in Vance was grounded in tort and thus the decision to apply the three-year statute of limitations in Vance was "not inconsistent" with the decision in Alexander, where "the gravamen of the complaint [was] breach of contract."  Id. at 799.

Although it is possible to detect the two-step decisional approach at work in Vance and other subsequent decisions, the lines of authority, regretfully, have not been clear or clean.  In fact, some commentators have opined that Tennessee appellate decisions addressing gravamen for purposes of the statute of limitations are irreconcilable.  Donald F.

Paine, Please Pass the Biscuits and Gravamen, 29 Tenn. B.J. 20, 20 (1993). We recognize that clarity is very important because "parties dealing with statutes of limitations can face a bewildering number of possible statutes and possible defenses to these statutes, especially with a plaintiff pleading multiple theories of substantive liability." 22 Steven W. Feldman, Tennessee Practice: Contract Law and Practice § 12:92, at 192 (Supp. 2014) [hereinafter Contract Law and Practice].

Today we clarify that the two-step approach articulated in Vance and applied in Alexander and Harvest Corp. is the correct framework for courts to employ when ascertaining the gravamen of a claim for the purpose of choosing the applicable statute of limitations. When utilizing this approach, a court must first consider the legal basis of the claim and then consider the type of injuries for which damages are sought. This analysis is necessarily fact-intensive and requires a careful examination of the allegations of the complaint as to each claim for the types of injuries asserted and damages sought. Contract Law and Practice § 12:78, at 595 (2006).

### C.  Application of the Two-Step Approach

In determining that the gravamen of Ms. Elliott's claim was for injury to real property, the Court of Appeals, like the early decisions of this Court, focused almost exclusively upon the type of damages she had requested. Employing the two-step Vance approach, we conclude that the basis of Ms. Elliott's claim is breach of contract. Ms. Elliott alleged, and the trial court found, that the contract had been breached because she had not received the sixty-foot wide strip of property contemplated by the contract. The trial court dismissed Ms. Elliott's claims of intentional and negligent misrepresentation. The sole legal basis of Ms. Elliott's prevailing claim against the defendants is breach of contract.

Moreover, the type of injuries for which Ms. Elliott sought to recover resulted from the breach of contract. Cf. Vance, 547 S.W.2d at 933 (concluding that the gravamen was injury to property where the plaintiff elected not to seek the contract remedy of rescission). Specific performance, which Ms. Elliott sought, is available solely for breach of contract claims. The trial court refused to order it here because BE had constructed detention ponds in the area where the sixty-foot strip of property would need to be located. The trial court instead awarded Ms. Elliott money damages for the diminution in value to her remaining property resulting from the lack of the contractually guaranteed access road. This injury is financial only, involving no injury to the real property itself. Although diminution in value damages may be recovered for both tort and contract claims,[9] the diminution in value

---

[9] See BVT Lebanon Shopping Ctr., LTD. v. Wal-Mart Stores, Inc., 48 S.W.3d 132, 135-36 (Tenn. 2001) (holding that an appropriate measure of damages for breach of a covenant of continuous occupancy

damages Ms. Elliott sought to recover flowed directly from her breach of contract claim. Thus, because the legal basis of the claim is breach of contract and the damages sought and awarded are for breach of contract, we conclude that Ms. Elliott's breach of contract claim is governed by the six-year statute of limitations applicable to "[a]ctions on contracts not otherwise expressly provided for." Tenn. Code Ann. § 28-3-109(a)(3).[10]

## IV. Conclusion

Having concluded that the Court of Appeals erred by holding that Ms. Elliott's claim is barred by the three-year statute of limitations, we reverse the intermediate appellate court's judgment and remand this matter to the Court of Appeals for resolution of the other issues the defendants raised on appeal. Costs in this Court are taxed to the defendants, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE

---

is the diminution in the property's fair market value and stating that "[t]his holding is in line with Tennessee law regarding the general remedy for breach of contract"); Vance, 547 S.W.2d at 931 (recognizing that the plaintiff could recover for the diminution in value of personal property in a tort action); Craighead, 2008 WL 3069320, at *8 & n.5 (stating that diminution in value is an available remedy for both breach of contract and tort actions involving injury to property).

[10] Because we have concluded that the six-year statute of limitations governs Ms. Elliott's claim, we need not address the other issue she raised regarding the date of accrual of her cause of action.