# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
September 8, 2016 Session

## WILLIAM THOMAS MCFARLAND
### v.
## MICHAEL S. PEMBERTON ET AL.

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Roane County**
No. 2014-105            Jon Kerry Blackwood, Senior Judge
_____

**No. E2014-02176-SC-R11-CV – Filed September 20, 2017**
_____

This appeal addresses the authority of a county election commission to make a factual determination on the qualifications of a candidate seeking to be placed on a ballot. In this case, the defendant filed a petition to run for circuit court judge. A registered voter filed a complaint with the county election commission arguing that the defendant did not reside in the judicial district and, consequently, should not be placed on the ballot. The election commission held a hearing on the complaint and voted unanimously to place the defendant on the ballot. The defendant won the election. The plaintiff, the defendant's defeated opponent in the election, filed this election contest based solely on the defendant's alleged failure to meet the residency requirement. The trial court and the Court of Appeals dismissed the complaint. Both held that the substance of the plaintiff's complaint was a challenge of the election commission's administrative decision on the defendant's residency, governed by the 60-day statute of limitations in Tennessee Code Annotated section 27-9-102 for a petition for a writ of certiorari. Because the complaint was not filed within sixty days of the county election commission's final decision, it was dismissed as untimely. On appeal to this Court, we hold that, by necessary implication, the county election commission had the authority under Tennessee's election statutes to hold a quasi-judicial hearing to make a factual determination to resolve the voter's complaint challenging the defendant's residency. We also hold that the county election commission's decision to certify the defendant as a qualified candidate on the ballot was a final administrative decision subject to judicial review by common-law writ of certiorari. The plaintiff, who had actual notice of the county election commission's actions, was "aggrieved" by the election commission's final administrative decision within the meaning of Tennessee Code Annotated section 27-9-101 and, thus, had standing to file a petition for a writ of certiorari. Though the plaintiff's complaint was

styled as an election contest, the gravamen of the complaint is a request for judicial review of the county election commission's decision, reviewable through a petition for a writ of certiorari and subject to the 60-day statute of limitations for such a petition. Because the plaintiff filed his complaint well after expiration of the 60-day period, we affirm the lower courts' dismissal of the complaint as untimely.

Tenn. R. App. P. 11 Appeal by Permission; Judgment of the
Chancery Court and Court of Appeals Affirmed

HOLLY KIRBY, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and ROGER A. PAGE, JJ., joined. CORNELIA A. CLARK, J., filed a dissenting opinion. SHARON G. LEE, J., joined in Justice Clark's dissenting opinion and also filed a separate dissenting opinion.

William Thomas McFarland, Kingston, Tennessee, appellant, Pro Se[1]

Jennifer E. Raby, Patrick C. Cooley, and J. Polk Cooley, Kingston, Tennessee, for the appellee, Michael S. Pemberton

Herbert H. Slatery III, Attorney General and Reporter; Andrée Blumstein, Solicitor General; and Ryan A. Lee, Assistant Attorney General, for the appellees, Roane County Election Commission; Lowell P. Malmquist, Vickie Watts, Ralph DePorter, Celia Simon, and James Ryan, Roane County Election Commissioners; and Mark Goins, Tennessee Coordinator of Elections

OPINION

FACTS AND PROCEDURAL BACKGROUND

This appeal concerns a judicial election for the Ninth Judicial District in East Tennessee.[2] The Ninth Judicial District includes four counties: Loudon, Meigs, Morgan, and Roane.

---

[1] Mr. McFarland was represented by attorneys Wm. Ritchie Pigue and Matthew C. Pietsch in the trial court, but he represented himself on appeal to the Court of Appeals and continues to represent himself in this appeal.

[2] The material facts in this case are undisputed, and the same facts serve as the bases for both the majority and dissenting opinions. The only disputed issues involve the application of the law to these facts.

On February 3, 2014, Defendant/Appellee Michael S. Pemberton filed a nominating petition with the Roane County Election Commission ("Election Commission") to run for Circuit Court Judge for the Ninth Judicial District. The election was to take place on August 7, 2014. In his petition, Mr. Pemberton listed as his residence an address in Roane County ("Roane County home"). It is undisputed that Mr. Pemberton purchased the Roane County home in January 2013. At all times pertinent to this appeal, Mr. Pemberton owned a home in Knox County in addition to the Roane County home.

Plaintiff/Appellant William Thomas McFarland also filed a petition as a candidate for election as Circuit Court Judge for the Ninth Judicial District in the same election.

On March 31, 2014, a resident of the Ninth Judicial District, Willis Hall, went to the Election Commission for the purpose of challenging Mr. Pemberton's candidacy based on his residency. Article VI, section 4 of the Tennessee Constitution provides that every candidate for circuit court judge "shall[,] before his election, have been a resident . . . of the circuit or district one year." Tenn. Const. art. VI, § 4 (emphasis added). The Roane County Administrator of Elections, Charles Holiway ("the Administrator"), told Mr. Hall he could either obtain an Elections Complaint Form online or the office could print one for him. He also told Mr. Hall at that time that someone else had already contacted the Tennessee Election Commission in Nashville, Tennessee, raising the issue of Mr. Pemberton's residency. According to the Administrator, Mr. Hall left his office without filing anything, but he returned later that day with a completed Elections Complaint Form and filed it against Mr. Pemberton.[3] Mr. Hall averred in his complaint that Mr. Pemberton did not meet the constitutional residency requirement because he was "not a resident of the [Ninth Judicial] district." Mr. Hall asserted that, for this reason, Mr. Pemberton "should not be on the ballot" for circuit court judge.

In response to Mr. Hall's complaint, the Administrator contacted the Tennessee Election Commission about Mr. Hall's allegations. The record reflects that Mark Goins, the Tennessee Election Coordinator ("Coordinator"), responded by letter indicating that

---

[3] In an affidavit filed in the trial court below, the Administrator recounted that Mr. Hall was the only person he told about the call to the state election commission. Later that day, the Administrator had a telephone conversation with Mr. McFarland on an unrelated matter. The Administrator averred that, in that conversation, Mr. McFarland volunteered that he "was not the person who had called the elections office in Nashville concerning Mr. Pemberton's residency." The Administrator said that he "never mentioned anything to Mr. McFarland about another person having called the elections office in Nashville and . . . had never told anyone other than Mr. Hall about someone having done so."

the Roane County Election Commission needed to resolve the issue of Mr. Pemberton's residency.[4]

Accordingly, the Election Commission conducted an independent investigation to determine whether Mr. Pemberton was a resident of Roane County. To that end, the Election Commission elicited documentary evidence from both Mr. Hall and Mr. Pemberton and set the matter for a public hearing at its regular meeting on April 28, 2014. Notice of the hearing was published in a local paper, the Roane County News.

Mr. McFarland was aware of the upcoming Election Commission hearing on Mr. Pemberton's residency; in fact, at the time, he served as the Roane County Attorney and in that capacity was a legal advisor to the Election Commission. Mr. McFarland did not serve as legal advisor to the Election Commission during the hearing on Mr. Pemberton's residency, however, based on a conflict of interest.[5] As noted above, by the time of the hearing, Mr. McFarland was also a candidate for the position Mr. Pemberton sought. Nevertheless, Mr. McFarland did not participate in the Election Commission hearing in any capacity.

Mr. Hall retained counsel to represent him at the hearing.[6] Mr. Pemberton represented himself at the hearing. Prior to the hearing, both Mr. Hall and Mr. Pemberton submitted materials to the Election Commission regarding Mr. Pemberton's residency. Those materials included U-Haul receipts, vehicle and voter registrations, Mr. Pemberton's driver's license, and utility bills. All of the submissions were made "part of the official minutes of the [Election Commission] meeting."[7]

---

[4] The letter from the Coordinator to the Election Commission is not included in the record on appeal. However, the letter is referenced in a transcript of the hearing below, which is in the record, and the comments in the hearing indicate that the Coordinator instructed the Election Commission on resolving the issue of Mr. Pemberton's residency.

[5] It is unclear whether Mr. McFarland declined to serve as legal advisor to the Election Commission in the proceedings because he had previously represented Mr. Hall (the complainant) in an unrelated legal suit or because he had filed to run as a candidate in the same election as Mr. Pemberton. In any event, the Election Commission retained attorney Frank Q. Vettori for the hearing for the purpose of "only answer[ing] questions from the [C]omission itself and only pertaining to legal matters."

[6] Mr. Hall retained attorney Wesley Kliner to represent him at the hearing. Mr. Kliner is, among other things, a former Hamilton County Election Commissioner, and he preceded Mark Goins as the Tennessee Coordinator of Elections.

[7] Although those submissions were made a part of the Election Commission minutes, they were not included in the record in this appeal. As we indicate *supra* at note 3, a transcript of the actual hearing is included in the appellate record. Comments made at the hearing indicate that the parties also submitted

The hearing was conducted as scheduled on April 28, 2014. Mark Goins, the Tennessee Coordinator of Elections, attended via speakerphone.[8] At the outset, the Election Commission read aloud Tennessee Code Annotated section 2-2-122, which sets forth several principles for determining residency for purposes of the election statutes. The chair indicated that the statute was read "so everybody understands what we are talking about here."

The Election Commission then permitted Mr. Hall and Mr. Pemberton to each present a fifteen-minute argument and answer questions from the commission members. Neither was allowed to ask questions of the other.

Through counsel, Mr. Hall argued that, during all or part of the year preceding the election (August 8, 2013 through August 7, 2014), Mr. Pemberton was actually a resident of Knox County. Counsel for Mr. Hall noted that Mr. Pemberton owned a 4,500-square-foot home in Knoxville—outside the Ninth Judicial District—and that he and his family had lived in the Knox County home for some period of time. Mr. and Mrs. Pemberton both worked in Knoxville, and their five-year-old son attended kindergarten in a Knox County school near Mrs. Pemberton's workplace. Counsel for Mr. Hall conceded that Mr. Pemberton also owned a home in Roane County during the relevant time period, but he characterized it as a "lake house" or a "vacation place" and pointed out that it was located fifty miles from Mr. Pemberton's law office. Based on these facts and other evidence in the record, counsel for Mr. Hall argued that the Roane County home was not Mr. Pemberton's primary residence, so he was not qualified to be a candidate for a circuit judge position in the Ninth Judicial District.

In response, Mr. Pemberton pointed out that he was born in Roane County, that he had lived there most of his life, and that his parents still lived in Roane County and were active in the community. He conceded that he and his wife and child had moved to Knoxville for a "20-month period" because it was closer to work. Nevertheless, Mr. Pemberton claimed, he purchased the Roane County home in January 2013 with the intention of returning to live there permanently. Mr. Pemberton said: "Knoxville to me is a place to sleep . . . and to work." He estimated to the Election Commission that he spent about 64% of his nights in his Roane County home, and he explained how his utility bills supported his assertion that he and his family lived primarily in the Roane County home. Mr. Pemberton argued that, under the law, residency is established by "intent plus

briefs, relevant legal authority, and affidavits to the Election Commission; those submissions are likewise not included in this appellate record.

[8] Assistant Coordinator of Elections Beth Henry Robertson and attorney Cara Hart also attended the public hearing via speakerphone.

action." He alleged that he had the requisite intent to reside in Roane County and had acted on that intent by purchasing the Roane County home and moving into it.

The Election Commission permitted other persons who attended the hearing to register to speak at the hearing. These so-called "secondary speakers" were each permitted three minutes to address the Election Commission. All of the secondary speakers at the hearing spoke in support of Mr. Pemberton. They generally corroborated Mr. Pemberton's assertion that he intended to reside permanently in Roane County, not Knox County. Mr. Pemberton's wife, Dana Pemberton, was among the secondary speakers. She reaffirmed that, at all relevant times, her husband intended to make the Roane County home their permanent address. She explained that their son attended a Knox County school so that she could be nearby during the day in case of an emergency.

At the conclusion of the hearing, the five Commissioners voted unanimously in favor of placing Mr. Pemberton on the ballot. They offered no explanation in connection with the vote. The decision to place Mr. Pemberton on the ballot as a candidate for Circuit Court Judge was included in the minutes of the Election Commission meeting for that day. Later that same day, the Election Commission certified Mr. Pemberton and Mr. McFarland as the only two candidates on the ballot for the Ninth Judicial District circuit judge position.

On May 16, 2014, Mr. Hall filed a complaint in the Roane County Chancery Court for quo warranto and for declaratory judgment, asking the trial court to declare Mr. Pemberton disqualified as a candidate for circuit judge for lack of the requisite residency. The complaint named Mr. Pemberton, the Election Commission, and the Commission members as defendants. In it, Mr. Hall directly challenged the Election Commission's decision on Pemberton's residency and asked that the Commission's vote to place Mr. Pemberton on the "ballot be designated as constituting an exercise of power not conferred by law and/or being conducted outside the laws and regulations governing elections, and, therefore, invalid and void ab initio." Subsequently, Mr. Hall filed a motion to amend the complaint to include a petition for writ of certiorari pursuant to Tennessee Code Annotated section 27-9-101 (2014).[9]

On July 23, 2014, the chancery court entered an order denying Mr. Hall's motion to amend and dismissing his complaint. The chancery court held that Mr. Hall did not have standing to file the complaint because he was not "aggrieved" by the Election

---

[9] That statute provides: "Anyone who may be aggrieved by any final order or judgment of any board or commission functioning under the laws of this state may have the order or judgment reviewed by the courts, where not otherwise specifically provided, in the manner provided by this chapter." Tenn. Code Ann. § 27-9-101 (2014).

- 6 -

Commission's decision within the meaning of section 27-9-101. Mr. Hall did not appeal the chancery court's order.[10]

Meanwhile, the controversy over Mr. Pemberton's residency played out in the local news media, fueled by comments by both candidates. In early April 2014, Mr. Pemberton told the Roane County News that he was "not the least bit concerned about Mr. McFarland's latest attack" based on his residency. Mr. McFarland pointed out that a private citizen had filed the complaint against Mr. Pemberton and added that "people are rightly concerned about a candidate's qualifications." Mr. McFarland explained: "You have to be qualified to run for this office or any other office, and if you do not live in the district, then you are not qualified to run for this office. It's not an attack. I think people want to know if [Mr. Pemberton is] qualified." Around the same time, the Knoxville News Sentinel quoted Mr. McFarland as saying, "It appears to me that Mr. Pemberton has not lived in this district for [the required] time period." Mr. Pemberton countered, "Rockwood [in Roane County] is my home. It has always been my home." Mr. Pemberton acknowledged, however, that he also "happens to have a place in Knoxville where I stay on occasion."

On May 21, 2014, after Mr. Hall filed his chancery court complaint, the Roane County News reported: "The controversy surrounding the residency of circuit court judge candidate Mike Pemberton is not over." The article stated that Mr. Pemberton had accused Mr. McFarland "of being behind the chancery court complaint." Mr. McFarland responded, "I haven't seen the complaint, but if it's a complaint that says he does not live in the district, I agree with it, and so does [sic] a lot of other people." After the chancery court dismissed Mr. Hall's complaint, Mr. McFarland told the Roane County News that he was glad because dismissal of the lawsuit "leaves the issues for the voters to decide." Mr. Pemberton's Roane County residency, or lack thereof, remained an issue in the judicial campaign; various posts on the "Tom McFarland for Circuit Court Judge" Facebook page stated: "Vote for Tom! He lives here!" and "We want a judge that lives here!"

The election was conducted as scheduled on August 7, 2014. Mr. Pemberton won; he received 13,357 votes (50.6%) to Mr. McFarland's 13,017 (49.4%).

On August 20, 2014, Mr. McFarland filed an election contest in the Roane County Chancery Court pursuant to Tennessee Code Annotated section 2-17-101, et seq.[11] Mr.

---

[10] We need not address the correctness of the chancery court's dismissal of Mr. Hall's complaint for lack of standing.

- 7 -

McFarland named as defendants Mr. Pemberton, the Roane County Election Commission, the five members of the Election Commission in their official capacities,[12] and Mark Goins in his official capacity as the Tennessee Coordinator of Elections. The challenge to the election was premised solely on Mr. McFarland's assertion that Mr. Pemberton did not satisfy the constitutional residency requirement and, therefore, was not qualified to hold the office of circuit court judge for the Ninth Judicial District. On this basis, Mr. McFarland asked the trial court to declare the election void pursuant to sections 2-17-112 and 2-17-113.

On September 8, 2014, Mr. Pemberton filed a motion to dismiss or, in the alternative, for summary judgment. Mr. Pemberton asserted in the motion that he was entitled to judgment as a matter of law based on (1) the 60-day statute of limitations for appealing an administrative decision (Tennessee Code Annotated section 27-9-102 (2014)[13]), (2) the doctrines of res judicata and collateral estoppel, and (3) gross laches. A few days later, the Election Commission defendants[14] filed a motion for summary judgment; the grounds in that motion were limited to the argument that Mr. McFarland's complaint was time-barred under section 27-9-102 because he failed to file a timely challenge to the Election Commission's decision on Mr. Pemberton's residency.

In response, Mr. McFarland argued, among other things, that he was not obligated to appeal the Election Commission's decision on Mr. Pemberton's residency because the Election Commission did not have the authority to hold a hearing and resolve the citizen complaint filed by Mr. Hall. Mr. McFarland asserted that the Election Commission is a ministerial body, authorized to perform only ministerial tasks, and does not have the authority to conduct a quasi-judicial hearing. He argued that residency is a mixed question of law and fact, so the Election Commission should have deferred the question to a court of competent jurisdiction rather than holding a hearing and resolving the issue itself. Because the Election Commission's actions were unauthorized, Mr. McFarland

---

[11] Mr. McFarland's complaint was filed within five days of August 15, 2014, the day the election results were certified, in accordance with the election contest statutes. Tenn. Code Ann. § 2-17-105 (2014).

[12] The five Commissioners named were Lowell P. Malmquist, Vickie Watts, Ralph DePorter, Celia Simon, and James Ryans.

[13] This statute provides that any party "aggrieved" by the administrative decision "shall, within sixty (60) days from the entry of the order or judgment, file a petition of certiorari in the chancery court." Tenn. Code Ann. § 27-9-102 (2014).

[14] In this Opinion, any position attributed to the Election Commission or the "Election Commission defendants" includes the individual commission members who were sued in their official capacities and the Tennessee Coordinator of Elections, Mark Goins.

maintained, the decision was void, he was not obliged to appeal the decision, and the decision had no preclusive effect under the doctrines of res judicata or collateral estoppel. Mr. McFarland further argued that the facts did not support a dismissal on the grounds of gross laches.

On September 30, 2014, the trial court held a hearing on the defendants' motions to dismiss and for summary judgment.[15]  On October 9, 2014, it entered an order granting the motions and dismissing Mr. McFarland's complaint.  The trial court held that the hearing conducted by the Election Commission was a quasi-judicial act and that the decision resulting from that hearing was a final administrative decision.  The proper method of challenging the Election Commission's decision, the trial court held, was by filing a petition for writ of certiorari pursuant to Tennessee Code Annotated section 27-9-102.  The trial court noted that section 27-9-102 requires the petition for writ of certiorari to be filed within sixty days of the final decision.  Because Mr. McFarland did not file a petition for writ of certiorari within sixty days of the Election Commission's final decision on Mr. Pemberton's residency, the trial court held that his claim was time-barred.  Mr. McFarland appealed.

The Court of Appeals affirmed the decision of the trial court.  See McFarland v. Pemberton, No. E2014-02176-COA-R3-CV, 2015 WL 7166407, at *8 (Tenn. Ct. App. Nov. 16, 2015), perm. app. granted (Tenn. Mar. 24, 2016).  The appellate court first agreed with the trial court that the Election Commission hearing was a quasi-judicial proceeding and that its decision on Mr. Pemberton's residency was a final administrative decision.  Id. at *3-4.  It held specifically that the Election Commission acted within its statutory authority in holding the hearing to determine whether Mr. Pemberton was qualified to be placed on the ballot.  Id. at *5-6.

The appellate court then determined that Mr. McFarland was a party who was "aggrieved" by the Election Commission's decision because "he had a 'special interest in the agency's final decision.'"  Id. at *7 (quoting Wood v. Metro. Nashville & Davidson Cnty. Gov't, 196 S.W.3d 152, 158 (Tenn. Ct. App. 2005)).  Noting that the sole issue raised in Mr. McFarland's election challenge was Mr. Pemberton's residency, the appellate court said that the substance of Mr. McFarland's complaint was "a challenge to the Commission's quasi-judicial proceeding and final determination" and the appropriate method for challenging that decision was through a writ of certiorari under section 27-9-101.  Id.  Because Mr. McFarland did not file his challenge to the administrative decision within sixty days, the appellate court concluded that Mr. McFarland's claim "is time-barred pursuant to Tenn. Code Ann. § 27-9-102" and, consequently, the court was

---

[15] The record does not include a transcript of that hearing.

without jurisdiction to adjudicate his claim.[16]  Id. at \*8  Accordingly, the Court of Appeals affirmed the trial court's dismissal of his complaint.  Id.

We granted Mr. McFarland permission to appeal to this Court.

ISSUES ON APPEAL AND STANDARD OF REVIEW

The decision presented for our review is the trial court's grant of summary judgment.[17]  We review a grant of summary judgment de novo, with no presumption of correctness in the trial court's decision.  Rye v. Women's Care Ctr. of Memphis, MPLLC, 477 S.W.3d 235, 250 (Tenn. 2015).  Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Tenn. R. Civ. P. 56.04.  On appeal, we must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied."  Rye, 477 S.W.3d at 250.

In the order granting this appeal, we instructed the parties to brief the following issues:

(1)  Did the county election commission have the authority to convene a hearing in response to a citizen's complaint and determine whether a candidate for the position of Circuit Court Judge for the Ninth Judicial District satisfied the constitutional residency requirement set out in article VI, section 4 of the Tennessee Constitution?

(2)  Is the county election commission's determination that the candidate for Circuit Court Judge for the Ninth Judicial District satisfied the constitutional residency requirement a quasi-judicial act that is subject to review pursuant to Tennessee Code Annotated section 27-9-101?

---

[16] While the appellate court did not make a specific finding on Mr. Pemberton's assertion of gross laches, it expressed reluctance to void an election when Mr. McFarland "waited to challenge Pemberton's qualifications until after the election" and commented that waiting until after the election to file the challenge prejudices both the candidate whose qualifications are questioned and his financial supporters. *McFarland*, 2015 WL 7166407, at \*8.

[17] The trial court did not indicate in its order whether it was granting Mr. Pemberton's motion to dismiss on the pleadings or for summary judgment.  From our review of the record, however, it is apparent that the trial court relied on matters outside the pleadings in making its decision.  Therefore, we treat the decision as a grant of summary judgment in favor of all of the defendants. *See Gibson v. Trant*, 58 S.W.3d 103, 107 (Tenn. 2001).

(3) Did the Court of Appeals err in holding that the plaintiff, although not a party to the petition seeking review pursuant to section 29-9-101, nevertheless qualifies as an aggrieved party for purposes of seeking review pursuant to section 27-9-101?

(4) Did the Court of Appeals err in holding that the plaintiff's failure to seek review of the county election commission's determination pursuant to section 27-9-101 now bars the plaintiff from filing an election contest pursuant to Tennessee Code Annotated section 2-17-101?

None of these issues involves a material factual dispute. Rather, all involve the interpretation of statutes and other issues that are purely legal in nature. Consequently, we address the issues in this appeal de novo, giving no deference to the decisions of the lower courts. See Tennessean v. Metro. Gov't of Nashville, 485 S.W.3d 857, 862-63 (Tenn. 2016).

ANALYSIS

I. Background on Election Code

As background for our analysis of the issues presented in this appeal, a brief review of the structure of Tennessee's Election Code is in order.

In 1972, Tennessee's General Assembly enacted the Election Code "to regulate the conduct of all elections." Tenn. Code Ann. § 2-1-102 (2014). The stated goals are to secure "freedom and purity of the ballot," to require voters "to vote in the election precincts in which they reside," to promote "[i]nternal improvement . . . by providing a comprehensive and uniform procedure for elections," and to encourage "[m]aximum participation by all citizens in the electoral process." See id.

"It is well settled that the power of the Legislature, except as restrained by the Constitution, is supreme . . . in the creation of subordinate governmental agencies, and in prescribing their powers and duties." Waldaur v. Britton, 113 S.W.2d 1178, 1181 (Tenn. 1938) (quoting White v. Decatur, 144 So. 873, 874 (Ala. 1932)). In exercising its power to regulate elections, the General Assembly enacted chapter eleven of the Election Code, which created the state election commission. Tenn. Code Ann. § 2-11-101 (2014); see Peterson v. Dean, 777 F.3d 334, 337-38 (6th Cir. 2015) (describing the statutory hierarchy of state and county election officials). The seven members of the state election commission are elected "by joint resolution of both houses of the general assembly." Tenn. Code Ann. § 2-11-104(b) (2014). By statute, the state election commission is

bipartisan; four of its members must be from the majority political party and three must be from the minority political party.  Id. § 2-11-103(a) (2014).

In turn, the state election commission appoints the members of the county election commissions. Each county has its own election commission, with five members to each commission.  Id. § 2-12-101(a) (2014).  Similar to the state election commission, the county election commissions are bipartisan, each with three members from the majority political party and two from the minority political party.  County election commission members hold office for two years.  Id.  Each county election commission appoints a county administrator of elections "who shall be the chief administrative officer of the commission and who shall be responsible for the daily operations of the office and the execution of all elections."  Id. § 2-12-201(a); see id. § 2-12-116(1).

Further, the Election Code requires Tennessee's Secretary of State to appoint a Coordinator of Elections ("Coordinator").  The Coordinator serves as the "chief administrative election officer of the state."  Id. § 2-11-201(b).  Tennessee Code Annotated section 2-11-202 lists the duties of the Coordinator.  See generally id. § 2-11-202 (2014).  One of the Coordinator's many duties is to "[a]dvise election commissions, primary boards, and administrators of elections as to the proper methods of performing their duties."  Id. § 2-11-202(a)(3).  The Coordinator is also required to "[a]uthoritatively interpret the election laws for all persons administering them."  Id. § 2-11-202(a)(4).  In addition, the Coordinator must "maintain uniformity in the application, operation and interpretation of the election code," id. § 2-11-201(b), and "may make rules and regulations as necessary to carry out the provisions of the election code," subject to the Secretary of State's concurrence, id. § 2-11-201(c).

Relevant to this case, the Election Code requires the Coordinator to "[e]nsure that all election commissions within the state shall prohibit any person from becoming qualified to have such person's name placed on any ballot wherein such person is seeking to be nominated or elected to an office for which such person is ineligible."  Id. § 2-11-202(a)(12).  Under the statutes, the county election commissions must have ballots printed "on which shall be only the names of candidates who have qualified."  Id. § 2-5-202; see id. § 2-5-204 (indicating that "[e]ach qualified candidate's name shall be placed on the ballot as it appears on the candidate's nominating petitions" except under certain circumstances).

The Election Code further provides that meetings by boards and commissions created under the election statutes must be open to the public and are subject to the Tennessee Open Meetings Act, Tennessee Code Annotated section 8-44-101, et seq.  Id. § 2-1-113(a)(2) (2014).  The boards and commissions must give notice of meetings, and the official minutes of such meetings are to "be kept in permanent form and shall include

the vote of each member on all issues passed upon. Minutes shall be available to the public for examination at reasonable times." Id. § 2-1-113(a)(4).

In this appeal, Mr. McFarland argues that, by conducting a quasi-judicial hearing to resolve the complaint on Mr. Pemberton's residency, the Election Commission exceeded its authority. Mr. McFarland cites two bases for this argument: (1) the Election Commission made a determination on a constitutional issue, thus violating the separation of powers provisions in the Tennessee Constitution, Article II, sections 1 and 2, and (2) the Election Code does not specifically grant the Election Commission the authority to perform anything other than ministerial tasks, nor does it grant authority to determine a candidate's residency by necessary implication. We address these issues in turn.

## II. Separation of Powers

Mr. McFarland first argues that, in making a determination on the question of Mr. Pemberton's residency, the Election Commission violated the separation of powers provisions in the Tennessee Constitution, Article II, sections 1 and 2.[18] In support, Mr. McFarland cites this Court's decision in City of Memphis v. Shelby Cnty. Election Comm'n, 146 S.W.3d 531, 533 (Tenn. 2004).

In City of Memphis, the City passed an ordinance which, if approved by the voters in a referendum, would have permitted the City to levy an additional privilege/payroll tax. City of Memphis, 146 S.W.3d at 534. The ordinance was duly enacted by the Memphis City Council, signed by the City Mayor, and submitted to the Shelby County Election Commission for placement on the local election ballot. However, Tennessee's Coordinator of Elections sent a letter to the Shelby County Election Commission declaring that he would not approve any ballot that contained the ordinance because it was "unconstitutional unless and until the General Assembly authorizes cities to impose such a tax." Id. (quoting letter from the Coordinator to the Shelby County Election Commission). After the county election commission received the Coordinator's letter, it refused to place the ordinance on the ballot. The City then filed a petition in chancery court, asking the court to require the county election commission to put the ordinance on

---

[18] Article II, section 1 provides: "The powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial." Tenn. Const. art. II, § 1. Article II, section 2 provides: "No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." Tenn. Const. art. II, § 2.

the ballot. After the trial court refused to do so, the City was granted permission to appeal directly to the Tennessee Supreme Court.[19] Id. at 534-35.

This Court in City of Memphis reversed the trial court's decision. It held that neither the Coordinator of Elections nor the county election commission had the authority to refuse to include a duly enacted referendum question on a ballot based on either's opinion that the measure was "substantively unconstitutional." Id. at 536-38. In reaching that conclusion, the Court noted that nothing in the Election Code granted either the Coordinator or the county election commission the authority to make a substantive constitutional ruling. It held: "Determining the substantive constitutionality of such measures is a function reserved for the judicial branch of government." Id. at 536. The City of Memphis Court observed that any statute that would purport to grant the Coordinator or the county election commission "such broad interpretive authority would run afoul of the principle of separation of powers embodied in the Tennessee Constitution," because only the judiciary is empowered to rule on the constitutionality of a legislative enactment. Id. at 537. Describing the Coordinator and the members of the county election commissions as "ministerial officers," the Court concluded that such officers "are prohibited from exercising this uniquely judicial function" of determining the constitutionality of statutes and ordinances. Id. at 535, 538.

McFarland argues that City of Memphis applies in this case. Because the residency requirement at issue emanates from the Tennessee Constitution, Article VI, section 4, the argument goes, resolving an issue regarding a candidate's residency is tantamount to deciding a constitutional issue. This argument fails. The relevant constitutional language is clear; it requires a candidate for circuit judge to "have been a resident . . . of the circuit or district one year." Tenn. Const. art. VI, § 4. The question presented to the Election Commission in Mr. Hall's complaint required no interpretation of this provision. The issue presented was merely factual, namely, "the factual question of whether the Candidate resides in [Roane] County." Knox Cnty. Election Comm'n v. Breeding, E2012-01094-COA-R3-CV, 2012 WL 2146310, at *3 (Tenn. Ct. App. June 14, 2012) (emphasis in original); see also Huskey v. Crisp, 865 S.W.2d 451, 454 (Tenn. 1993) (holding that the legal definition of "residence" varies depending on context and approving of the appellate court's conclusion that "the issue of residence was a question of fact for the jury to determine"); Asberry v. Garrett, No. 01-A-01-9511-CH-00515, 1996 WL 334366, at *2 (Tenn. Ct. App. June 19, 1996) ("The issue of one's residence is a question of fact.").

---

[19] Given the time-sensitive nature of the case, the City filed a motion asking the Supreme Court to assume jurisdiction over the appeal pursuant to Tennessee Code Annotated section 16-3-201, and this Court granted the City's motion. *City of Memphis*, 146 S.W.3d at 534-35.

Thus, City of Memphis is not applicable in this case, and we reject Mr. McFarland's argument that the Election Commission's decision on Mr. Pemberton's residency violated the doctrine of separation of powers.

## III. Election Commission Authority

Mr. McFarland next argues that the Election Commission had no authority to make a final administrative decision on Mr. Pemberton's residency. He first asserts that the Election Commission's actions were legislative because the Commission "made new law rather than execute one already in existence." Appellant's Brief at p. 12, McFarland v. Pemberton, No. 2014-105 (Tenn. Apr. 22, 2016). Even if the Election Commission's actions were not legislative, Mr. McFarland argues, the Election Commission still overstepped its authority because county election commissions are authorized to perform only ministerial duties, and the decision on Mr. Pemberton's residency went beyond the performance of a ministerial duty.

In response, Mr. Pemberton and the Election Commission defendants maintain that the Election Commission proceedings were quasi-judicial in nature, not legislative, because the Commission merely applied the law as written and did not enact any new laws. They note that the Election Code authorizes the Election Commission to perform many tasks that are not ministerial in nature. Because the Election Code expressly requires the Election Commission to ensure that only qualified candidates are placed on the ballot, they argue that the Election Commission is, by necessary implication, also authorized to do what is needed to carry out this express duty, including making a quasi-judicial determination on whether a candidate is qualified to be on the ballot.

We first ascertain the nature of the proceedings conducted by the Election Commission in this case, and then we address whether the Election Commission's actions were within its authority.

### A. Nature of the Election Commission Proceedings

A governmental act is "legislative" if it creates new laws, such as ordinances or regulations. Fallin v. Knox Cnty. Bd. of Comm'rs, 656 S.W.2d 338, 342 (Tenn. 1983) (contrasting legislative actions with those that are quasi-judicial). Applying this principle, we have little difficulty concluding that the proceedings conducted by the Election Commission were not legislative in nature. In making a determination on Mr. Pemberton's residency, at no time did the Election Commission purport to create new law. Consequently, we reject Mr. McFarland's argument that the Election Commission's actions were legislative in nature.

- 15 -

We agree, however, with Mr. McFarland that the Election Commission actions at issue in this appeal were not merely "ministerial." It appears instead that the Election Commission's determination on Mr. Pemberton's residency was "quasi-judicial" in nature. This Court has described the difference between a ministerial act and a quasi-judicial act as follows:

> The law recognizes certain duties of public officials as ministerial and others as discretionary or quasi judicial. . . . "[W]hile it is not always easy to determine where the line of distinction (demarcation) lies between a ministerial act and an act involving the exercise of judgment, the distinction . . . (between) merely ministerial and judicial and other official acts is generally said to be that, where the law prescribes and defines the duties . . . to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment, the act is ministerial, but where the act to be done involves the exercise of discretion and (or) judgment it is not to be deemed merely ministerial."

State ex rel. Hammond v. Wimberly, 196 S.W.2d 561, 563 (Tenn. 1946) (quoting State ex rel. Millers Nat'l Ins. Co. v. Fumbanks, 151 S.W.2d 148, 150 (Tenn. 1941)); accord Mayor of City of Jackson v. Thomas, 313 S.W.2d 468, 480-81 (Tenn. 1957) (comparing various definitions of "ministerial act" as contrasted with "judicial act"); see City of Memphis, 146 S.W.3d at 535 (quoting Black's Law Dictionary 52[3] (7th ed. 1999)) ("A 'strictly ministerial duty' is defined as: 'A duty that is absolute and imperative, requiring neither the exercise of official discretion nor judgment.'"); State ex rel. Stewart v. Marks, 74 Tenn. (6 Lea) 12, 20 (1880) (noting that some duties of the board of inspectors were ministerial, such as counting votes, but determining which votes were genuine and intelligible was a quasi-judicial act).

Clearly the Election Commission's factual determination on Mr. Pemberton's residency required the exercise of discretion and judgment. The Election Commission conducted a hearing at which the members considered statements by Mr. Hall's attorney and by Mr. Pemberton, heard remarks by other scheduled speakers, and weighed utility bills and various other indicia of where Mr. Pemberton had resided for the year preceding the election. At the conclusion of the hearing, the Election Commission members took a vote and unanimously voted to place Mr. Pemberton on the ballot. Under all of these circumstances, the Election Commission's factual determination on Mr. Pemberton's residency and the resulting decision to place Mr. Pemberton on the ballot as a candidate for circuit judge constituted the performance of a quasi-judicial function.

### B. Election Commission as Ministerial Body

Mr. McFarland contends that county election commissions are merely ministerial bodies, with no authority to undertake tasks that are not ministerial in nature. Thus, he asserts, the Election Commission had no authority to conduct a quasi-judicial hearing and to make a factual determination on Mr. Pemberton's residency, and its actions are, therefore, null and void.

As Mr. McFarland suggests, we must ascertain whether the Election Commission was acting within its authority when it resolved Mr. Hall's complaint regarding Mr. Pemberton's compliance with the residency requirement:

> It is a fundamental rule of law that the departments, agencies, and commissions of government have no inherent or common-law power of their own. They are purely creatures of statute. Accordingly, governmental agencies have only those powers expressly granted by statute and those powers required by necessary implication to enable them to fulfill their statutory mandate. Actions taken by a governmental agency without the required authority are nullities.

State ex rel. Comm'r of Transportation v. Med. Bird Black Bear White Eagle, 63 S.W.3d at 768-69 (Tenn. Ct. App. 2001) (citations omitted); see also In re Sentinel Trust Co., 206 S.W.3d 501, 519 (Tenn. Ct. App. 2005).

Resolving this issue requires interpretation of the Election Code with respect to the authority granted to the Election Commission. "The construction of a statute presents a question of law, and this Court interprets statutes de novo with no presumption of correctness accorded to the rulings of the courts below." Martin v. Powers, 505 S.W.3d 512, 518 (Tenn. 2016) (citing Baker v. State, 417 S.W.3d 428, 433 (Tenn. 2013)). "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." In re Kaliyah S., 455 S.W.3d 533, 552 (Tenn. 2015) (quoting Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)). "To that end, we begin with the actual words of the statute, to which we accord their natural and ordinary meaning." Martin, 505 S.W.3d at 518 (citing Baker, 417 S.W.3d at 433).

In various contexts over the years, this Court has referred to county election commission members as "ministerial officers." For example, in City of Memphis, the Court cited favorably several cases characterizing the Coordinator and the members of county election commissions as "ministerial officers" with "limited discretion":

> The City correctly points out that the Coordinator and the Commission [members] are ministerial officers. Shelby County Election Comm'n v.

Turner, 755 S.W.2d 774, 776 (Tenn. 1988) ("[T]he Election Commission has only ministerial duties."); Peeler v. State ex rel. Beasley, 190 Tenn. 615, 231 S.W.2d 321, 323 (1950) (holding that the duties of county election commissions are ministerial); Curtis v. State, 163 Tenn. 220, 43 S.W.2d 391 (1931); Taylor v. Carr, 125 Tenn. 235, 141 S.W. 745, 750 (1911) (holding that "the duties of commissioners of election are only ministerial"); see State ex rel. Tidwell v. Morrison, 152 Tenn. 59, 274 S.W. 551, 552 (1924). The trial court in this case accurately characterized the Commission's duties as ministerial. The Commission and the Coordinator respectively perform important functions vital to the maintenance and advancement of our political system. Nonetheless, as ministerial officers, the Commission and the Coordinator have limited discretion.

City of Memphis, 146 S.W.3d at 535 (footnote omitted).

To be sure, under most circumstances, many of the duties of the county election commissions listed in the Election Code may fairly be described as ministerial, such as certifying voting machines, keeping and writing the minutes of commission meetings, and determining a uniform time for opening the polls.[20] See Tenn. Code Ann. § 2-12-116(6), (12), & (13). Other duties in the Election Code, however, inherently involve a level of discretion and judgment. For example, county election commissions are required to "promulgate such policies as are necessary to aid the personnel of the election commission office in the performance of their duties." Tenn. Code Ann. § 2-12-116. They also are charged with appointing an administrator of elections, approving a budget, hiring legal counsel, and adopting and implementing procedures to preserve the integrity and security of the vote. See Tenn. Code Ann. § 2-12-116 (1), (2), (4), and (15); see also Tenn. Code Ann. § 2-12-201 (listing duties for the county election commission administrators).

Importantly, the Election Code also requires county election commissions and their administrators to process voter registration applications. Generally, United States citizens who are Tennessee residents and are eighteen years old before the date of the next election are qualified voters, and they may register to vote in the precinct in which they reside. Id. §§ 2-2-102, -104, -107. The Election Code requires the county administrator of elections to declare a registrant to be a registered voter if he determines

---

[20] However, even duties which appear on their face to be ministerial, such as counting votes, may in some circumstances require the exercise of judgment and discretion. *See, e.g., Bush v. Gore*, 531 U.S. 98, 107 (2000) (referring to the various Florida county election commissions using "varying standards to determine what was a legal vote" in the 2000 presidential election); *Marks*, 74 Tenn. at 20 (noting that some duties of the board of inspectors were ministerial, such as counting votes, but determining which votes were genuine and intelligible was a quasi-judicial act).

from the registrant's answers to the questions on the application "and other questions, if necessary," that the registrant is entitled to register. Id. § 2-2-120 (2014). If the administrator rejects the registration, the registrant has a right to appeal the administrator's decision to the county election commission. Id. § 2-2-125(a)-(b). Under the Election Code, "[t]he action of the [county] commission on the registrant's application for registration on appeal shall be a final administrative action." Id. § 2-2-125(c). This provision explicitly gives county election commissions the authority to make a quasi-judicial final administrative decision regarding voter qualifications. Id.

Moreover, the Tennessee Coordinator of Elections, as the State's chief administrative officer responsible for elections, supervises all elections in cooperation with the county election commissions and "[a]dvise[s] election commissions, primary boards, and administrators of elections as to the proper methods of performing their duties." Id. § 2-12-202(a)(3). The Coordinator is also required to "[a]uthoritatively interpret the election laws for all persons administering them," id. § 2-11-202(a)(4), "maintain uniformity in the application, operation and interpretation of the election code," id. § 2-11-201(b), and "may make rules and regulations as necessary to carry out the provisions of the election code," subject to the concurrence of the Secretary of State, id. § 2-11-201(c). Relevant to this case, the Election Code requires the Coordinator to "[e]nsure that all election commissions within the state shall prohibit any person from becoming qualified to have such person's name placed on any ballot wherein such person is seeking to be nominated or elected to an office for which such person is ineligible." Id. § 2-11-202(a)(12).

These Election Code provisions demonstrate that the Coordinator is not merely a ministerial officer and county election commissions are not strictly ministerial bodies. This Court acknowledged as much in City of Memphis:

> Without question, the Commission and the Coordinator have certain statutorily prescribed ministerial duties that allow—indeed require—them to do such things as examine ballot initiatives to determine whether signature requirements are met, determine whether submissions are timely, and determine whether candidates have properly qualified to be placed on the ballot. See Tenn. Code Ann. § 2-1-101 through –216 (2003) et seq.

Id. (emphasis added).

The Sixth Circuit has addressed the nature of the statutory responsibilities given to county election commissions in the context of determining whether a county election commission could permissibly dismiss an administrator based on political party affiliation. Peterson 777 F.3d at 341-42. Generally, the Peterson court explained,

- 19 -

dismissal based on political party affiliation, referred to as "patronage dismissal," is prohibited unless the employee had been serving in a confidential and/or policymaking position. Id. at 341 (discussing Elrod-Branti exception to general prohibition against patronage dismissal, which refers to Branti v. Finkel, 445 U.S. 507 (1980), and Elrod v. Burns, 427 U.S. 347 (1976)). In the course of determining whether county election administrators hold a "policymaking" position, the court discussed the nature of the positions of county administrator and county election commission member. The appellate court noted that county election commission members hold policymaking positions, described as "[p]ositions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted." Id. at 342-43. Election administrators, the court held, have even greater discretion in that they are given "a significant amount of the total discretionary authority available to…." the election commissions. See id. at 346-47.

The Sixth Circuit acknowledged several Tennessee Supreme Court opinions indicating "that the office of election administrator is purely ministerial in nature, with only limited discretionary powers." Id. at 347. It noted, however, that those decisions addressed the issue in different contexts, and it concluded that the election administrator's duties are not merely ministerial:

> No doubt, administrators execute numerous clerical, administrative, and purely ministerial responsibilities. The administrator must requisition supplies, maintain voter registration files, conduct classes for poll workers, prepare election notices, compile and disseminate information to the public, and attend seminars. . . . Moreover, the fact that some duties of the administrator may be classified as "ministerial" does not preclude the determination that other designated duties, such as budgeting, reapportionment, and acting as an adviser to the commission are policymaking and inherently political tasks.

Peterson, 777 F.3d at 347.

After reviewing the Election Code provisions on the duties of county election commissions, we disagree with Mr. McFarland's contention that county election commissions are merely ministerial bodies with no authority to undertake tasks that are not ministerial in nature.[21] The Election Code clearly gives county election commissions

---

[21] This does not indicate disagreement with the holding in *City of Memphis* that county election commissions do not have the authority to perform a purely judicial function such as interpreting the State constitution.

- 20 -

the authority to perform functions that are discretionary in addition to their ministerial duties. It specifically makes a county election commission's rejection of a voter registration application a "final administrative action," which is certainly discretionary rather than ministerial. See Tenn. Code Ann. § 2-2-125(c). We agree with the Court of Appeals below that "it would be a mistake to suggest county election commissions only have the authority to perform ministerial functions." McFarland, 2015 WL 7166407, at *5 (citing the Peterson district court opinion, Peterson v. Dean, No. 3:09-628, 2013 WL 652525, *8 (W.D. Tenn. Feb. 21, 2013), aff'd 777 F.3d 334 (6th Cir. 2015)). In discharging their statutory duties, county election commissions perform both ministerial and discretionary functions. See Tenn. Cable Television Ass'n v. Tenn. Pub. Serv. Comm'n, 844 S.W.2d 151, 158 (Tenn. Ct. App. 1992) (noting that the Tennessee Public Service Commission exercises "co-mingled legislative, executive, and judicial functions").

### C. Authority Implied by Necessity

We must now address whether the Election Code grants county election commissions the implicit authority to resolve a challenge to a judicial candidate's qualifications to hold office. This is an issue of first impression with this Court.

Mr. McFarland argues that, even if the Election Commission's powers are not limited to ministerial functions, the Election Code does not expressly authorize county election commissions to hold a hearing when a candidate's residency is questioned. Consequently, he contends, the Election Commission did not have authority to resolve Mr. Hall's complaint regarding Mr. Pemberton's residency. Only a court may make such a determination, he argues, so the Election Commission was required to file a court proceeding to address Mr. Pemberton's residency in response to Mr. Hall's complaint.

In response, Mr. Pemberton and the Election Commission defendants argue that the legislature implicitly granted county election commissions, in cooperation with the Coordinator, the authority to hold hearings to resolve qualification disputes as a necessary means of carrying out their joint duty to ensure that only qualified candidates are placed on the ballot. They maintain that county election commissions necessarily have the implicit authority to hold quasi-judicial hearings on disputes about candidate qualifications in order to effectively carry out their duty to place only qualified candidates on the ballot.

As noted above, the general rule is well-settled that boards and commissions are creatures of statute and can exercise only such authority as is conferred upon them by statute. Medicine Bird Black Bear White Eagle, 63 S.W.3d at 768-69; In re Sentinel Trust Co., 206 S.W.3d at 519. It is equally well-settled, however, that when a statute

- 21 -

imposes a mandatory duty upon a governmental agency to carry out express and specifically defined purposes and objectives, the statute carries with it by necessary implication the authority to do whatever is reasonably necessary to effectuate the legislative mandate. Medicine Bird Black Bear White Eagle, 63 S.W.3d at 768-69 ("[G]overnmental agencies have only those powers expressly granted by statute and those powers required by necessary implication to enable them to fulfill their statutory mandate.") (emphasis added); In re Sentinel Trust Co., 206 S.W.3d at 519 (same); Mayhew v. Mayhew, 376 S.W.2d 324, 327 (Tenn. App. 1963) ("[W]hen a power is given by statute, everything necessary to make it effectual is given by implication."). Authority vested in an administrative agency by necessary implication "must have its source in the language of the statutes themselves." See Sanifill of Tenn., Inc. v. Tenn. Solid Waste Disposal Control Bd., 907 S.W.2d 807, 810 (Tenn. 1995).

> One treatise explains:
>
> A statute which confers powers or duties in general terms includes by implication all powers and duties incidental and necessary to make the legislation effective. . . . "[W]here a statute grants a specific power or imposes a definite duty, it also, in the absence of limitation, by implication confers authority to employ all the means that are usually employed, and that are necessary to the exercise of the power conferred or to the performance of the duty imposed." In other words, that which is clearly implied is as much a part of a law as that which is expressed. Courts have most frequently extended statutes by necessary implication in the realm of laws which delegate powers to public officers and administrative agencies. The powers granted may involve a multitude of functions discoverable only through practical experience.

Norman J. Singer & Shambie Singer, Sutherland Statutes & Statutory Construction § 55:4 (7th ed. 2016) (footnotes and citations omitted) (noting relevant cases from numerous jurisdictions); see e.g., Stockmeier v. Bd. of Parole Comm'rs, 255 P.3d 209, 212 (Nev. 2011) (citation omitted) ("An administrative agency's powers are generally limited to the powers set forth by statute, although 'certain powers may be implied even though they were not expressly granted by statute, when those powers are necessary to the agency's performance of its enumerated duties.'"); Vickers v. Lowe, 247 P.3d 666, 669 (Idaho 2011) (citation omitted) ("Since the Legislature cannot possibly foresee all the practical difficulties that state agencies will encounter while carrying out their statutory functions, 'administrative agencies have the implied or incidental powers that are reasonably necessary in order to carry out the powers expressly granted.'"). Agency authority may not be implied by necessity if doing so would "contravene specific statutory language, [or] run counter to the general objectives of the statute." R.R.

Comm'n v. Tex. Coast Utils. Coalition, 357 S.W.3d 731, 737 (Tex. Ct. App. 2011) (citations omitted), aff'd sub nom. Texas Coast Utils. Coal. v. R.R. Comm'n of Texas, 423 S.W.3d 355 (Tex. 2014). "[I]t is the responsibility of a reviewing court to ensure that an agency's administrative actions do not exceed its legislatively conferred powers. That said, the breadth of an agency's authority encompasses all express and implied powers necessary to fulfill the legislative scheme that the agency has been entrusted to administer." In re Virtua-W. Jersey Hosp. Voorhees for a Certificate of Need, 945 A.2d 692, 698 (N.J. 2008) (citation omitted).

Against this backdrop, we consider the pertinent provisions of the Election Code. As noted above, the Election Code was enacted "to regulate the conduct of all elections." Tenn. Code Ann. §§ 2-1-101. One of its stated goals was to secure "freedom and purity of the ballot." Id. § 2-1-102. To that end, the Coordinator supervises all elections and advises all county election commissions and administrators "as to the proper methods of performing their duties." Id. § 2-12-202(a)(3). The Coordinator is to "[a]uthoritatively interpret the election laws for all persons administering them," id. § 2-11-202(a)(4), and "maintain uniformity in the application, operation and interpretation of the election code," id. § 2-11-201(b).

More specifically, the Election Code directs county election commissions to print ballots "on which shall be only the names of candidates who have qualified." Id. § 2-5-202 (emphases added); see id. § 2-5-204 (indicating that "[e]ach qualified candidate's name shall be placed on the ballot as it appears on the candidate's nominating petitions" except under certain circumstances). The Coordinator must "[e]nsure that all election commissions within the state shall prohibit any person from becoming qualified to have such person's name placed on any ballot wherein such person is seeking to be nominated or elected to an office for which such person is ineligible." Id. § 2-11-202(a)(12) (emphases added). Thus, the Election Code tasks both the Coordinator and the county election commissions with the duty of ensuring that only eligible, qualified candidates are placed on election ballots. The Election Code does not, however, provide the method by which the Coordinator and the county election commissions are to discharge this duty in the event of a question or challenge regarding a candidate's qualifications or eligibility for the office sought.

A review of election laws in other jurisdictions reveals a wide variety of approaches. Some, like Tennessee, do not specify a method by which eligibility or qualification challenges must be addressed.[22] Other jurisdictions specify a particular

_____

[22] These states are examples of those that have no specific provision in their election laws prescribing a procedure for challenging a prospective candidate's qualifications for office: Alaska

procedure for challenging and determining a candidate's qualifications.[23] Many of those procedures include a temporal framework for the proceedings in recognition of the time-sensitive nature of pre-election challenges to candidate qualifications.[24] As we have observed, Tennessee's Election Code contains neither a special procedure nor any temporal framework for resolving a pre-election challenge to a candidate's qualifications.

Mr. McFarland argues that, because Tennessee's Election Code does not specifically grant the county election commissions the authority to hold hearings to address a candidate's qualifications, the legislature implicitly meant for such issues to be resolved by a court, either pre-election in an action for declaratory relief or post-election through an election contest. In support, he cites cases in which candidate qualification issues were resolved in court proceedings. See Comer v. Ashe, 514 S.W.2d 730, 741 (Tenn. 1974) (holding in a pre-election declaratory judgment act that "the courts have power, jurisdiction and authority to determine the eligibility of a candidate for State Senate" based on his age); Hatcher v. Bell, 521 S.W.2d 799, 803 (Tenn. 1974) (holding that candidate can file a post-election election contest challenging residency). Mr. McFarland cites Knox County Election Commission v. Breeding as an example of what

_____

(Alaska Stat. § 15.05.010, *et seq.*); Delaware (Del. Code Ann. tit. 15, § 101 *et seq.*); Iowa (Iowa Code § 39.1 *et seq.*).

[23] Some states permit eligible voters to challenge a candidate's qualifications through the administrative process by having a hearing before the appropriate election officials. *See, e.g.*, Ga. Code Ann. § 21-2-6 (providing that any eligible voter may file a written complaint challenging a candidate's qualifications with the county superintendent, and the matter is to be decided by the superintendent); Miss. Code Ann. § 23-15-963 (describing methods for contesting candidate qualifications with the appropriate election officials); N.C. Gen. Stat. Ann. § 163-127.3 (permitting voters to challenge a candidate's qualifications by filing a verified affidavit with the board of elections); Ohio Rev. Code Ann. § 3513.05 (permitting voters to challenge a candidate's qualifications by filing a protest with the relevant election officials); Wis. Stat. Ann. § 5.06 (permitting voters to file a "written sworn complaint" with the election commission regarding candidate qualifications). Other states require pre-election challenges to a candidate's qualifications to be brought in a court of law. *See, e.g.*, Ariz. Rev. Stat. Ann. § 16-351 (providing that voters can challenge a candidate's qualifications in court); Colo. Rev. Stat. Ann. § 1-13.5-301(3) (providing that a candidate's qualifications may be challenged by filing an action "in the district court in the county in which the local government is located); La. Stat. Ann. § 18:1403 (providing that "district courts shall have exclusive original jurisdiction of actions objecting to candidacy"); 25 Pa. Cons. Stat. § 3376 (providing that "contested nominations" of judges must be filed in the court of common pleas).

[24] *See generally* La. Stat. Ann. § 18:1409 (imposing time restrictions on court proceedings); N.C. Gen. Stat. Ann. § 163-127.4 (imposing time restrictions on the administrative hearing panel); *see also* Wis. Stat. Ann. § 5.06 (stating that a complaint under the statute "shall be filed promptly so as not to prejudice the rights of any other party" and that "[i]n no case may a complaint relating to nominations, qualifications of candidates[,] or ballot preparation be filed later than 10 days after the complainant knew or should have known that a violation of law or abuse of discretion occurred or was proposed to occur").

the Election Commission should have done in this case, which is to initiate a declaratory judgment action on its own behalf to resolve any questions raised about Mr. Pemberton's residency. No. E2012-01094-COA-R3-CV, 2012 WL 2146310, at *1 (Tenn. Ct. App. June 14, 2012); see Jordan v. Knox Cnty., 213 S.W.3d 751, 766 (Tenn. 2007) (holding that the county election commission has standing to seek declaratory judgment as to eligibility of those who filed qualifying petitions); Shelby Cnty. Elec. Comm'n v. Turner, 755 S.W.2d 774 (Tenn. 1988) (holding that the county election commission has standing to seek a declaratory judgment regarding whether office of juvenile court clerk should be on ballot). In her dissent, Justice Clark adopts a similar position, characterizing prior Tennessee caselaw as "holding that the authority of county election commissions is ministerial only."[25]

While it is clear that a county election commission may initiate court proceedings when a candidate's eligibility to run for a particular office is challenged, the issue before this Court is whether it must file such court proceedings. Mr. McFarland argues that county election commissions must file court proceedings because they are without authority to resolve eligibility issues themselves, despite the fact that they are charged with the duty of ensuring that only eligible persons are placed on the ballot. However, he points to no language in the Election Code limiting county election commissions in this way.

Qualifications to hold elected office come in all shapes and sizes. Some, such as minimum age requirements, are relatively uncomplicated and may typically be resolved by a county election commission by requiring the candidate to produce appropriate

---

[25] Justice Clark also argues in her dissent that a Tennessee statute, Tennessee Code Annotated section 2-5-101(g)(1)(E), "evinces the General Assembly's intent for courts, not county election commissions, to determine whether a candidate has satisfied constitutional residency requirements." It does not. Section 2-5-101(g)(1)(E) describes the process by which another candidate may qualify if, after the qualifying deadline, the current candidate can no longer run because he was "declared ineligible" or "disqualified by a court" or "disqualified by the political party executive committee," leaving no remaining candidates for the office on the ballot. Although the statute refers to disqualification by a court or by a political party executive committee, we disagree with Justice Clark's dissent that it indicates that a declaration of ineligibility may *only* be made by a court. The statute can be fairly read as not specifying the body that would make a declaration that a candidate is ineligible.

We note that Justice Lee joins in Justice Clark's dissent and incorporates its analysis into her dissent. Consequently, in responding to Justice Clark's dissent, we also respond to Justice Lee's insofar as it incorporates Justice Clark's analysis. We will respond separately to the other arguments made in Justice Lee's dissent.

- 25 -

documentation.[26]  See, e.g., Tenn. Const. art. II, § 10 ("No person shall be a Senator unless he shall be . . . of the age of thirty years . . . ."). Others may be more complicated. In Breeding, for example, the home of a candidate for a Knox County state House seat was situated on land that straddled the county line between Knox and Anderson counties, and the court was asked to issue a declaratory judgment on the county in which the candidate resided based on those specific facts.  Breeding, 2012 WL 2146310, at *1. Some, such as a requirement that a candidate be a licensed lawyer or be certified as a law enforcement officer, may require deference to the findings of another board or commission.  See, e.g., Bivens v. White, No. E2014-02251-COA-R3-CV, 2015 WL 5444126, at *8 (Tenn. Ct. App. Sept. 16, 2015) (noting that, under section 8-8-102, "[t]he POST Commission is the entity responsible for verifying a candidate's qualifications for the office of sheriff"); see also Tenn. Code Ann. § 17-1-106 (requiring that judges "shall be learned in the law, which must be evidenced by the judge being authorized to practice law in the courts of this state").

Questions regarding a candidate's qualifications may come from a voter such as Mr. Hall, from an opposing candidate such as Mr. McFarland, or from some other source. Challenges to a candidate's qualifications may arise well in advance of the upcoming election, or they may come up shortly before the election. See Barrett v. Giles County, No. M2010-02018-COA-R3-CV, 2011 WL 4600431, at *4 (Tenn. Ct. App. Oct. 5, 2011) ("Challenges to a candidate's right to appear on a ballot should ordinarily be brought before the election—preferably in time for the issue to be resolved before the ballots have to be printed and before the start of absentee and early voting."). Regardless of the type of qualification that is challenged, who raises the issue, or when the question arises, the legislative mandate imposed on the Coordinator and the county election commission is the same:  to ensure that only eligible, qualified candidates are placed on election ballots in order to secure "freedom and purity of the ballot."  Tenn. Code Ann. § 2-1-102(1); see also id. §§ 2-5-202, 2-11-202(a)(12).

Adopting the position advocated by Mr. McFarland and by Justice Clark in her dissent—that county election commissions have no authority to resolve a factual dispute on a candidate's qualifications—would tie the hands of the Coordinator and county election commissions and unduly limit them in discharging this duty.  Regardless of the circumstances, a county election commission would have no ability to investigate and make its own factual determination as to a candidate's qualifications, even if directed to do so by the Coordinator.  As was utilized by Mr. Hall in this case, Tennessee's Secretary of State makes an "Elections Complaint Form" available for voters to use to complain

---

[26] *But see Comer v. Ashe*, 514 S.W.2d 730 (Tenn. 1974), in which the question raised involved a candidate for State Senate who would not reach the minimum age for eligibility until shortly after the election.

- 26 -

about perceived election irregularities. According to Mr. McFarland and both dissents, neither the Coordinator nor county election commissions have the authority to resolve such a complaint or even to elicit documentation regarding a candidate's residency; both are powerless to do anything except file a lawsuit and await the court's decision.[27] If this were true, neither the Coordinator nor the county election commission could ensure a timely resolution of the challenge to the candidate's qualifications; because Tennessee's Election Code contains no temporal framework for resolving a question on a candidate's qualifications, the timeline would instead be in the discretion of the court. Elections do not wait for a judge to issue a ruling. Denying the Coordinator and county election commissions the authority to resolve a candidate residency issue in the first instance, as Mr. McFarland and both dissents urge, would run counter to the legislature's decision to charge them with the joint duties of placing qualified candidates on the ballot and efficiently administering elections.

Both Mr. McFarland and Justice Clark's dissent point to the fact that the Election Code includes a specific method for a voter to appeal the county election commission administrator's rejection of his voter registration application, and the method specified includes a quasi-judicial hearing before the county election commission. They contend that, because the Election Code does not specify a method for resolving questions about a candidate's qualifications, this means that the legislature did not intend for either the

---

[27] Justice Lee observes in her dissent that it is "highly unlikely" that pre-election litigation regarding a candidate's qualifications would be resolved in sufficient time prior to the election. That is precisely our point. We agree with Justice Lee that it is preferable to resolve disputes over candidate qualifications as soon as practicable, preferably well in advance of the election. *See Barrett*, 2011 WL 4600431, at *4. "Doing otherwise 'prejudices' the candidate whose qualifications are brought into question, as well as that candidate's financial supporters and those who voted for him." *McFarland*, 2015 WL 7166407, at *8 (citing *Barrett*, 2011 WL 4600431, at *4). The timing problem Justice Lee highlights supports our conclusion that the Election Commission necessarily has the authority to conduct a hearing and resolve the matter in the first instance. If it were prohibited from making a determination on a complaint challenging a candidate's qualifications (like Mr. Hall's), the county election commission's only alternative would be to file a pre-election declaratory judgment action and, as pointed out by Justice Lee, run a substantial risk of having the matter remain unresolved in time to prepare the ballots for voting, including early voting. *See Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 584 (6th Cir. 2006) ("Legal disputes involving election laws almost always take more time to resolve than the election cycle permits."). If that were to happen, the result would be a failure by the Coordinator and the county election commission to fulfill their joint statutory duty to make certain that the ballot lists only qualified, eligible candidates.

Our analysis applies standard legal principles that are neither novel nor unique. As is the case with any legal claim, our holding requires only that a candidate in Mr. McFarland's position *file* his lawsuit within the applicable statute of limitations, regardless of when it is resolved. Mr. McFarland is not relieved of this responsibility because he happens to be a candidate in an election.

Coordinator or county election commissions to have the authority to make an initial determination on a candidate's qualifications; they may only file a lawsuit asking a court to make the determination. We disagree. Among other things, the Election Code requires both the Coordinator and the county elections commissions to (1) ensure that only qualified voters are permitted to vote, and (2) ensure that only qualified candidates appear on the ballot. Id. § 2-11-202(a)(12) (Coordinator); id. § 2-5-202 (election commissions); id. § 2-5-204 (election commissions). The fact that the Election Code specifies the method for county election commissions to determine a voter's appeal as to the first legislative mandate does not mean that the legislature intended to leave either the Coordinator or county elections commissions powerless to carry out the second legislative mandate.

Opinions issued by the Office of Tennessee's Attorney General support this position. The Attorney General has indicated that, while county election commissions do not have "an absolute affirmative obligation . . . to seek out information regarding" a candidate's qualifications to hold the office for which he is applying, the county election commissions "should conduct a hearing" on the issue when "reliable information" is presented that indicates that a candidate is not qualified for office. Tenn. Att'y Gen. Op. 79-292 (June 15, 1979). The Attorney General later explained:

> [C]ounty election commissions have a duty not to put a candidate's name on the ballot if they know that the candidate is unqualified for the office he or she seeks. This duty is a negative corollary to the positive requirement of T.C.A. § 2-5-204(a) that "[e]ach qualified candidate's name shall be placed on the ballot as it appears on his nominating petitions."

> This Office has cautioned that a county election commission's duty not to put the name of an unqualified candidate on the ballot should not be construed as an affirmative obligation generally to seek out information regarding a candidate's qualifications. However, when "reliable information" is presented to a county election commission that a candidate is disqualified for some reason . . . the commission has a duty to conduct a hearing on that issue to determine whether the candidate is or is not qualified. It is not easy to define "reliable information" in the abstract, but it seems reasonable to require something more than an unsupported or uncorroborated allegation that a candidate is unqualified for some reason.

> Accordingly, in the event that a county election commission receives some "reliable information" that a candidate for sheriff has not obtained a mental health certification, it would have the duty to investigate and determine whether this statutory qualification for the office has been met.

- 28 -

It is reasonable to assume that, in conducting this investigation, a county election commission would have authority to require a candidate to produce proof of the certification required by T.C.A. § 8-8-102(a)(7). Without such authority county election commissions would have no way of obtaining the information they may need to satisfy their duty to determine whether a challenged candidate is qualified for office.

Tenn. Att'y Gen. Op. 94-108 (Sept. 20 1994) (emphasis added) (citations omitted).

We agree. The Election Code imposes upon the Coordinator and county elections commissions an affirmative duty to carry out an express and specifically defined objective, namely, to ensure that only eligible, qualified candidates are placed on Tennessee's ballots. These Election Code provisions carry with them, by necessary implication, the authority to take reasonably necessary measures to effectuate the legislative mandate. See In re Sentinel Trust Co., 206 S.W.3d at 519; Medicine Bird Black Bear White Eagle, 63 S.W.3d at 768-69; Sanifill of Tenn., Inc., 907 S.W.2d at 810. Given the inexorable deadlines involved in elections, what measures are reasonably necessary may depend on the circumstances, including the nature of the qualification that is challenged, the difficulty of resolving the challenge, and how far in advance of the election the challenge arises.

In her dissent, Justice Clark acknowledges Tennessee caselaw holding that an agency may have powers required by necessary implication to fulfill its statutory mandate, but she argues that this well-settled principle has no application to Tennessee's Election Coordinator or to county election commissions.[28] This highlights a juncture at which the majority and Justice Clark's dissent part ways. Seeing that the Election Code does not explicitly address whether or how a county election commission is to resolve questions about a candidate's qualifications, Justice Clark concludes that the legislature did not intend for a county election commission to have powers not explicitly set out in the Election Code and instead intended for county election commissions to bring such questions to a court. In contrast, we focus on the legislature's policy decision to entrust the Coordinator and county election commissions with the joint duty to make certain that only qualified persons are placed on Tennessee's election ballots. We conclude from this policy decision that the legislature would not have intended for us to construe the Election Code in a manner that would deny county election commissions the authority necessary for them to fulfill their statutory duties.

---

[28] Justice Clark's argument is based in part on observations regarding "the partisan nature of county election commissions." We note that the record in this case indicates that all members of the Election Commission present at the hearing voted in favor of placing Mr. Pemberton on the ballot.

Justice Clark's dissent also seeks to de-link the statutory duty of county election commissions to ensure that ballots contain "only the names of candidates who have qualified" from the statutory duty of the Coordinator to "[e]nsure that all election commissions within the state shall prohibit any person from becoming qualified to have such person's name placed on any ballot wherein such person is seeking to be nominated or elected to an office for which such person is ineligible." See Tenn. Code Ann. §§2-5-202, 2-11-202(a)(12).[29] We decline to do so. Under the facts of this case, the duties and implied powers of the Coordinator and the Election Commission must be viewed together. In this lawsuit, Mr. McFarland named as defendants both the Coordinator and the Election Commission. Moreover, when the Election Commission was confronted with Mr. Hall's complaint regarding Mr. Pemberton's residency, it consulted the Coordinator, whose statutory duties require him to "[a]dvise election commissions, primary boards, and administrators of elections as to the proper methods of performing their duties" and "[a]uthoritatively interpret the election laws for all persons administering them." Tenn. Code Ann. § 2-11-202(a)(3)-(4). Via speakerphone, the Coordinator was present at the Election Commission's hearing on Mr. Pemberton's residency. Thus, in the context of this case, the duties and implied authority of the Election Commission and the Coordinator are interrelated and must be analyzed as such. Therefore, respectfully, we do not agree with Justice Clark's separation of the Election Commission from the Coordinator under the facts of this case. Overall, we conclude that, in enacting the Election Code, the legislature intended for both the Coordinator and county election commissions to have authority that "encompasses all express and implied powers necessary to fulfill the legislative scheme that [they have] been entrusted to administer." In re Virtua-W. Jersey Hosp., 945 A.2d at 698.

---

[29] Justice Clark's dissent argues that a "qualified" candidate, as used in these statutes, "simply refers to a candidate who has filed a nominating petition that meets the statutory requirements and deadlines." Under this interpretation, a candidate would be "qualified" within the meaning of these statutes if he merely filed a nominating petition that appeared on its face to meet the constitutional and statutory requirements, regardless of whether the candidate *actually* met the requirements. We disagree. We read the term "qualified" in its normal and natural sense to include requiring candidates to *actually fulfill* the applicable residency requirement. *See Hatcher*, 521 S.W.2d at 800-03 (referring to allegations that defendant Hatcher did not meet the constitutional residency requirement for judges as asserting that he was "disqualified from holding the office to which he was elected" and "constitutional disqualification of the winning candidate").

Justice Clark's dissent also indicates that some statutes regarding the Coordinator's duties should not be considered because they use the term "ineligible." We do not view any distinction between the terms "disqualified" and "ineligible" as having a bearing on our analysis of the issues presented in this case. *See id.* at 800-04 (referring variously to the contention that defendant Hatcher did not meet the constitutional residency requirement for judges as "constitutional disqualification" or "ineligible" to hold the office).

Both Mr. McFarland and Justice Clark's dissent argue that the quasi-judicial hearing conducted by the Coordinator and the Election Commission was an unsatisfactory way to determine whether Mr. Pemberton was a resident of Roane County. Among other things, both observe that Mr. Pemberton's statement to the Election Commission was not sworn, and the interested parties did not have the right to engage in discovery. In addition, Mr. McFarland claims to have discovered some additional facts that were not brought to the attention of the Election Commission in the hearing.

We note that, even though Mr. McFarland was Mr. Pemberton's opposing candidate in the circuit judge election, Mr. McFarland nevertheless chose not to participate in the Election Commission hearing.[30] Had he participated, he could have raised his concerns about the proceedings, such as the fact that Mr. Pemberton's statement was unsworn.

In this case, both the Coordinator and the Election Commission proceeded in a deliberate but timely fashion when a question was raised regarding Mr. Pemberton's residency. After receiving Mr. Hall's complaint—on the form the Election Commission had supplied to him—the Commission sought guidance from Coordinator Goins. After consulting with Mr. Goins, the Election Commission set Mr. Hall's complaint for a formal hearing at their regular meeting and notified the public of the hearing. It permitted Mr. Hall (via retained counsel) and Mr. Pemberton to submit pre-hearing evidence and legal briefs to support their positions. No objection was made to the decision by the Election Commission and Coordinator Goins to hold a hearing to resolve the issue of Mr. Pemberton's residency.[31]

Under the facts of this case, holding a quasi-judicial hearing was a reasonably necessary measure to enable the Coordinator and the Election Commission to make a decision on whether to certify Mr. Pemberton on the ballot as a qualified candidate for the office of Circuit Court Judge for the Ninth Judicial District. The Election Commission hearing permitted both parties to fully present their positions, and allowed other interested parties (including Mr. McFarland had he chosen to do so) to participate, all

---

[30] Mr. McFarland has explained that he did not act as the legal advisor to the Election Commission because of a conflict of interest, but his argument appears to conflate his participation as legal counsel with his participation *as an interested party*. Any conflict of interest as legal counsel would not have precluded Mr. McFarland from participating in the hearing as the opposing candidate for the same position. Mr. McFarland has offered no reason for his decision not to participate in the hearing as an interested party.

[31] In fact, in his presentation to the Election Commission, counsel for Mr. Hall told the Election Commission, "[I]t is your job, commissioners, to make the decision" on Mr. Pemberton's residency.

open to the public. The Election Commission was able to receive the necessary information and make its decision in time for its own preparation for early voting and Election Day, and in time for the candidates, their contributors, and voters to act in light of the residency decision.

A prompt, efficient resolution to questions regarding candidate qualifications protects the integrity of the electoral process and serves the public interest by ensuring at an earlier stage that the candidates on the ballot are eligible to hold office. Under the Election Code, the Coordinator and the Election Commission had the implicit authority to conduct the quasi-judicial hearing in order to effectively carry out their joint duty to place only qualified candidates on the ballot. See, e.g., In re Sentinel Trust Co., 206 S.W.3d at 519; Medicine Bird Black Bear White Eagle, 63 S.W.3d at 768-69. Accordingly, we hold that the Election Commission in this case was authorized to conduct a quasi-judicial proceeding on Mr. Hall's complaint challenging Mr. Pemberton's residency.

IV. Judicial Review of Administrative Decision

In the course of ascertaining whether the Election Commission had authority to make a factual determination on Mr. Pemberton's residency, we have already determined that the Election Commission actions at issue in this case constituted a quasi-judicial administrative decision. This holding is important in another context; the nature of the administrative action drives the type of judicial remedy available.

The threshold question in determining whether an administrative decision is subject to judicial review by common-law writ of certiorari is whether the administrative body performed a legislative or a quasi-judicial function.[32] McCallen v. City of Memphis, 786 S.W.2d 633, 638 (Tenn. 1990) (citing Fallin, 656 S.W.2d at 341). "Common law certiorari is available where the court reviews an administrative decision in which that agency is acting in a judicial or quasi-judicial capacity." Davison v. Carr, 659 S.W.2d 361, 363 (Tenn. 1983); see Ben H. Cantrell, Review of Administrative Decisions by Writ of Certiorari in Tennessee, 4 Mem. St. U. L. Rev. 19, 20 (Fall 1973) (noting that the common-law writ of certiorari is available to review judicial or quasi-judicial actions of administrative bodies). The common-law writ is not available if the administrative decision at issue was legislative in nature; the judicial remedy for an erroneous legislative administrative action is a suit for declaratory judgment. Fallin v. Knox Cnty. Bd. of Comm'rs, 656 S.W.2d 338, 342 (Tenn. 1983); State ex rel. Moore & Assocs. v. West, 246 S.W.3d 569, 575 (Tenn. Ct. App. 2005).

---

[32] "The terms 'quasi-judicial' and 'administrative' are interchangeable in this context." *State ex. rel. Moore & Assocs. v. West,* 246 S.W.3d 569, 575 (Tenn. Ct. App. 2005).

Thus, if the agency's act is quasi-judicial, the proper method of challenging the governmental action is through common-law writ of certiorari, whereas a legislative action must be challenged by filing a declaratory judgment action. See McCallen, 786 S.W.2d at 638-40; Fallin, 656 S.W.2d at 342. "This distinction in remedies is made because [quasi-judicial] determinations . . . are accompanied by a record of the evidence produced and the proceedings had in a particular case, whereas, [legislative acts are] not ordinarily accompanied by a record of evidence." Fallin, 656 S.W.2d at 342; see Cantrell, 4 Mem. St. U. L. Rev. at 20.

As we have observed, the Election Commission's hearing in this case had many of the hallmark characteristics of an adversarial judicial proceeding.[33] After hearing the evidence and considering the governing Election Code provision, the Election Commission members voted to certify Mr. Pemberton as a qualified candidate on the ballot. Because the Election Commission was performing a quasi-judicial function, its decision was subject to judicial review by common-law writ of certiorari.

In arguing why the Election Commission hearing should not be deemed quasi-judicial, Justice Clark points out ways in which the proceedings did not follow judicial protocols. For example, her dissent notes that the witnesses were not placed under oath and the Rules of Evidence were not followed. We agree with the Court of Appeals below that "the hearing lacked the full formality of a judicial proceeding, but that is not the standard for a quasi-judicial act to which Tenn. Code Ann. § 27-9-101 would apply." McFarland, 2015 WL 7166407, at *4; see generally Cantrell, 4 Mem. St. U. L. Rev. at 20. A variety of agency decisions not necessarily made in conformity with judicial conventions have been deemed administrative or quasi-judicial decisions reviewable via a petition for a writ of certiorari. See, e.g., McCallen, 786 S.W.2d at 640-41 (holding that decision of city council approving zoning of development was administrative or quasi-judicial, and thus reviewed under a common law writ of certiorari); Fallin, 656 S.W.2d at 342 ("[T]he remedy of certiorari . . . will continue to be the proper remedy for one who seeks to overturn the determination of a Board of Zoning Appeals. . . ."); Davison, 659 S.W.2d at 362 (holding that, in an ouster proceeding, decision of Board of Commissioners of the City of Watauga was properly reviewed by common-law writ of certiorari); Moore & Assocs., 246 S.W.3d at 575 ("The decision of whether to grant a building permit, for example, is an administrative act, even if made by a legislative

---

[33] For example, each side was permitted to submit evidence and briefs in advance. At the beginning of the hearing, the chairman outlined the law governing the Commission's factual determination. The parties were allowed to make arguments. Other interested citizens were allocated time to give statements on behalf of the parties. Importantly, a court reporter made a record of the hearing. *See* Cantrell, 4 Mem. St. U. L. Rev. 19 at 20 (quoting Louis L. Jaffe, Judicial Control of Administrative Action 166, 173 (1965)) (noting that the term "judicial" refers to any proceeding between parties "where decision is to be taken on a record made at a hearing required by law").

body.") (citing McCallen, 786 S.W.2d at 639). Therefore, despite the fact that the Election Commission hearing was not governed by strict judicial rules,[34] our view is in line with that of the Court of Appeals: "The Commission applied existing law to the facts at hand to reach a decision, created a record of the proceeding, and issued a determination that authorized the Commission to certify the ballots without requiring approval of the board's decision from another government body. For these reasons, we find the hearing was quasi-judicial." McFarland, 2015 WL 7166407, at *4.

In their dissents, Justices Clark and Lee both claim that the Election Commission's vote and decision to place Mr. Pemberton on the ballot was not an "order or judgment" within the meaning of section 27-9-102. The decision of the Election Commission to place Mr. Pemberton on the ballot was no less a reviewable "order or judgment" than a resolution of a city council approving a planned development, see, e.g., McCallen, 786 S.W.2d at 634, or a vote by a municipal board of commissioners to remove one of their members from office, see Davison, 659 S.W.2d at 362. As the Election Commission's final administrative action, its vote and certification of Mr. Pemberton as a candidate for circuit court judge for the Ninth Judicial District constituted its "final order or judgment" within the meaning of section 27-9-101. Thus, we must respectfully disagree with both dissents' argument that the decision of the Election Commission was not reviewable by a petition for a writ of certiorari based on the lack of a final order or judgment.

We next consider Mr. McFarland's standing to file a petition seeking judicial review of the Election Commission's decision on Mr. Pemberton's residency. Tennessee Code Annotated section 27-9-101 authorizes "[a]nyone who may be aggrieved by any final order or judgment of any board or commission functioning under the laws of this state" to seek judicial review of the administrative decision by filing a petition for writ of certiorari in state court.[35] See Metro. Gov't of Nashville v. Bd. of Zoning Appeals of

---

[34] Justice Clark's dissent criticizes informalities in the Election Commission hearing, such as Election Commission members addressing Mr. Pemberton by his first name and the Election Commission chair's acknowledgment that he had known a speaker "a long time." We do not believe that these informalities signify any impropriety in the Election Commission proceedings.

[35] As we explained in *Stewart v. Schofield*, Tennessee Code Annotated section 27-8-101 codifies the common law writ of certiorari, and section 27-9-101 pertains to review of administrative decisions. 368 S.W.3d at 460 n.3. Section 27-8-101 provides:

> The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court, there is no other plain, speedy, or adequate remedy.

Tennessee Code Annotated section 27-9-101 provides:

Nashville, 477 S.W.3d 750, 757 (Tenn. 2015); Stewart v. Schofield, 368 S.W.3d 457, 460 & n.3 (Tenn. 2012). The next statute provides the statute of limitations for such actions, and specifies that the petition for the writ must be sought "within sixty (60) days from the entry of the order or judgment" to be reviewed. Tenn. Code Ann. § 27-9-102.

A party with standing to file a petition for writ of certiorari under section 27-9-101 is "anyone who may be aggrieved" by the administrative decision at issue. We have recognized:

> The doctrine of standing is used to determine whether a particular plaintiff is entitled to judicial relief. Knierim v. Leatherwood, 542 S.W.2d 806, 808 (Tenn. 1976). It is the principle that courts use to determine whether a party has a sufficiently personal stake in a matter at issue to warrant a judicial resolution of the dispute. SunTrust Bank, Nashville v. Johnson, 46 S.W.3d 216, 222 (Tenn. Ct. App. 2000). Persons whose rights or interests have not been affected have no standing and are, therefore, not entitled to judicial relief. Lynch v. City of Jellico, 205 S.W.3d 384, 395 (Tenn. 2006).
>
> "The sort of distinct and palpable injury that will create standing must be an injury to a recognized legal right or interest." Wood v. Metro. Gov't of Nashville and Davidson County, 196 S.W.3d 152, 158 (Tenn. Ct. App. 2005). Such a legal right or interest may, but not must, be created or defined by statute.

Metro. Gov't of Nashville, 477 S.W.3d at 755 (quoting State v. Harrison, 270 S.W.3d 21, 27-28 (Tenn. 2008)). "Extending the authority to appeal and to seek judicial review to all persons who are 'aggrieved' [under section 27-9-101] reflects an intention to ease the strict application of the customary standing principles." City of Brentwood v. Metro. Bd. of Zoning Appeals, 149 S.W.3d 49, 57 (Tenn. Ct. App. 2004) (quoting Federal Election Comm'n v. Akins, 524 U.S. 11, 19 (1998)); see Roten v. City of Spring Hill, No. M2008-02087-COA-R3-CV, 2009 WL 2632778, at *3 (Tenn. Ct. App. Aug. 26, 2009).

In this case, the question of standing presents in an unusual procedural context. Ordinarily, standing is raised by a defendant who seeks to have the case dismissed based on the petitioner's lack of standing; the petitioner then responds by arguing that he or she has the required special interest or special injury to maintain the suit. This case presents the converse. Mr. McFarland argues that he did not have standing to seek judicial review

---

Anyone who may be aggrieved by any final order or judgment of any board or commission functioning under the laws of this state may have the order or judgment reviewed by the courts, where not otherwise specifically provided, in the manner provided by this chapter.

of the Election Commission's decision, so he did not forgo an opportunity for judicial review of the Election Commission's decision. Mr. McFarland asserts that he could not have been "aggrieved" as that term is used in section 27-9-101 because he was not a party to the administrative proceeding and he did not attend or participate in the hearing.[36] He further contends that he did not suffer a legally cognizable injury as a result of the Election Commission's decision because the Commission proceedings took place in advance of the election. Mr. McFarland claims that he could not have been "aggrieved" until after he was defeated in the election by Mr. Pemberton. Thus, he was not an aggrieved party and could not have sought judicial review of the Election Commission's decision under section 27-9-101.[37]

This question requires us to construe section 27-9-101.[38] As we have noted, the role of this Court in statutory interpretation is "to assign a statute the full effect of the

---

[36] In her dissent, Justice Clark wonders "how anyone, particularly someone who did not participate in the hearing, could have discerned that" judicial review of the Election Commission's decision to place Mr. Pemberton on the ballot could be obtained through a petition for a writ of certiorari. She notes that "nothing in the record indicates that Mr. McFarland was advised that he could seek judicial review of the Election Commission's determination." As explained below, this Court did not make the choice to permit someone who is not a party to administrative proceedings to file a petition for a writ of certiorari to review the administrative decision; that was a policy decision made by the legislature when section 27-9-101 was enacted in 1932. Although Mr. McFarland chose not to participate in the Election Commission's public hearing on Mr. Pemberton's residency, it is undisputed that he had *actual* knowledge of it. As to anyone advising Mr. McFarland that he could seek judicial review of the Election Commission's decision, we note that Mr. McFarland is not only an attorney, he was the county attorney for the Election Commission itself. *And* he sought to be elected as a trial judge for that judicial district. We do not think that the Election Commission was obliged to advise Mr. McFarland of his legal rights with respect to its decision.

[37] In support of his argument, Mr. McFarland cites the reasoning of the Michigan intermediate appellate court in *Martin v. Secretary of State*, 760 N.W.2d 726 (Mich. Ct. App. 2008). He fails to note, however, that the intermediate appellate decision in *Martin* was reversed. *See Martin v. Secretary of State*, 755 N.W.2d 153, 154 (Mich. 2008).

[38] Instead of analyzing section 27-9-101, Justice Lee asserts that "[n]o candidate should have to spend time and money during a campaign to litigate an issue that would be rendered moot by the candidate's win at the polls." Respectfully, a candidate's preference in this regard is not relevant to our legal interpretation of section 27-9-101; it is safe to assume that *many* claimants facing the expiration of an applicable limitations period have reasons why they would prefer not to file their lawsuit at a given time. In enacting section 27-9-101, the legislature did not carve out an exception for persons who might prefer not to have to meet its accompanying statute of limitations. Our job in this appeal is to use established legal principles to interpret the statutes and then apply them to the facts of this case.

Justice Lee's dissent also makes assertions such as "the majority's decision renders the election contest statute meaningless." Again, this is hyperbole, not legal analysis. Justice Lee's dissent offers no explanation on how she would expect the Coordinator and county election commissions to discharge their

legislative intent without restricting or expanding the intended scope of the statute." Metro. Gov't of Nashville, 477 S.W.3d at 756 (citing Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 526 (Tenn. 2010), and Larsen–Ball v. Ball, 301 S.W.3d 228, 232 (Tenn. 2010)). In doing so, we give the words of the statute "their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." Id. (quoting Mills v. Fulmarque, Inc., 360 S.W.3d 362, 368 (Tenn. 2012)).

In Metro Gov't of Nashville v. Bd. of Zoning Appeals of Nashville, we were called upon to construe the phrase "anyone who may be aggrieved" as used in section 27-9-101. In that case, the Nashville zoning board granted a private party a permit to erect one billboard and a permit to improve another one. Metro. Gov't, 477 S.W.3d at 753. The Metropolitan Government of Nashville ("Metro"), while apparently not a party to the zoning board proceedings, filed a petition for a writ of certiorari seeking judicial review of the zoning board's decision. Id. The chancery court held that Metro did not have standing to file the petition. Metro appealed, and the Court of Appeals reversed. Id. at 754. We granted permission to appeal.

On appeal, the Metro Gov't Court noted that "Section 101 refers to 'anyone,'" and added that the Court was not "aware of any . . . authority limiting the definition of the term 'anyone,' as that word is used in Section 101, to exclude Metro as a potential petitioner." Id. at 757. The Court stated: "Section 101 '[e]xtend[s] the authority . . . to seek judicial review [of boards of zoning appeals decisions] to all persons who are 'aggrieved' [and] reflects an intention to ease the strict application of the customary standing principles.'" Id. at 758 (quoting City of Brentwood, 149 S.W.3d at 57); see also Roten, 2009 WL 2632778, at *3 (noting that section 27-9-101 should be interpreted broadly). On this basis, the Metro Gov't Court held that Metro fell within the scope of the phrase "anyone who may be aggrieved by any final order or judgment of any board or commission functioning under the laws of this state" in section 27-9-101. Id. at 757-58.

As in Metro Gov't, we are not aware of any authority limiting the definition of the term "anyone" as used in section 27-9-101 to exclude Mr. McFarland. Id. at 757. It is undisputed that Mr. McFarland had notice of the Election Commission hearing on Mr. Pemberton's residency, and he is not excluded on the basis that he chose not to participate in it. Similarly, we have little trouble concluding that Mr. McFarland had a cognizable injury and was "aggrieved" by the Election Commission's decision to place Mr. Pemberton on the ballot for circuit judge of the Ninth Judicial District. Mr. Pemberton was Mr. McFarland's opponent for the same position; in fact, he was Mr.

---

joint statutory duty to ensure that only qualified candidates are placed on the ballots if they are prohibited from making even a routine initial determination on a factual question regarding a candidate's qualifications.

McFarland's only opponent. The Election Commission's factual determination on Mr. Pemberton's residency and the resulting decision to place him on the ballot, if erroneous, forced Mr. McFarland into a contested election against an opponent who was not qualified to hold office. See Wood, 196 S.W.3d at 158; see also Martin v. Sec'y of State, 755 N.W.2d 153, 154 (Mich. 2008) ("[A] candidate for elective office suffers a cognizable injury in fact if, due to the improper interpretation and enforcement of election law, he or she is prevented from being placed on the ballot or must compete against someone improperly placed on the ballot."). This is the same type of special interest held to support standing for a candidate who files a pre-election declaratory judgment action challenging the opposing candidate's qualifications to hold office. See Comer v. Ashe, 514 S.W.2d at 742 (upholding the standing of a state senate candidate in a pre-election declaratory judgment action against his opponent for alleged ineligibility to hold office based on age).

Thus, Mr. McFarland had a sufficient special interest and/or personal stake in the outcome of the Election Commission's decision so as to qualify as "anyone who may be aggrieved" by the decision. His decision not to participate in the Election Commission hearing does not change the fact that he had notice of it and had a personal stake in the outcome of it. Therefore, he had standing to seek judicial review of the Election Commission's final decision under section 27-9-101.

In sum, Mr. McFarland had an available statutory remedy, to seek judicial review of the Election Commission's decision under section 27-9-101, and he failed to avail himself of this statutory remedy during the election with Mr. Pemberton. We next consider the consequences of his failure to do so.

## V. Gravamen of the Complaint

Mr. McFarland filed his complaint in this case with the heading "Complaint to Contest Election." It cites Tennessee Code Annotated section 2-17-101, Tennessee's election contest statute, as the basis for his claim for relief.

The Court of Appeals below held that, despite being styled as an election contest, Mr. McFarland's complaint was in substance an appeal from the Election Commission's administrative decision. The appellate court reasoned that "the appropriate method for obtaining judicial review of [a quasi-judicial action of an administrative body] is by common law writ of certiorari."[39] McFarland, 2015 WL 7166407, at *7 (quoting Moore

---

[39] The trial court had also held that Mr. McFarland's complaint was barred by the 60-day statute of limitations, reasoning that "the proper method of challenging the Election Commission's determination was by a writ of certiorari as provided by in the Tenn. Code Ann. [§] 27-9-102."

- 38 -

& Assocs., 246 S.W.3d at 575). As such, the court treated Mr. McFarland's complaint as a petition for writ of certiorari. Because a petition for a writ of certiorari must be filed within sixty days of the administrative decision, and Mr. McFarland's complaint was filed well outside the 60-day limitations period, the appellate court held that it was time-barred. Id. (citing Tenn. Code Ann. § 27-9-102).

In the case upon which the Court of Appeals relied, Moore & Associates, the local zoning board administrator refused to issue a certificate of compliance for the plaintiff's hotel. 246 S.W.3d at 573. The plaintiff did not appeal the administrator's decision to the zoning board, as provided by statute. Instead, the plaintiff filed a declaratory judgment action against the zoning administrator, asking the court to declare that the hotel was in compliance with the zoning code and require the zoning administrator to issue a certificate of compliance. Id. The trial court granted the relief sought, and Metro government appealed. Id. at 573-74.

On appeal, the Court of Appeals in Moore & Associates noted that the plaintiff chose not to appeal the administrator's decision to the zoning board. A zoning board's decision on whether to issue a certificate of compliance is a quasi-judicial decision, not a legislative one, the appellate court held. As such, the zoning board's decision is reviewable by a court only through a writ of certiorari, and only after all administrative remedies have been exhausted. Id. at 577-78, 581. By filing a declaratory judgment action based on the decision of the zoning administrator, the appellate court surmised, the plaintiff sought to circumvent the narrower standard of review applicable to a petition for writ of certiorari.[40] After reviewing the complaint, the appellate court viewed it as, in effect, a petition for writ of certiorari. It held: "Regardless of the name given to the

---

[40] The court in *Moore & Associates* explained the apparent reason for the plaintiff's decision to file a declaratory judgment action as opposed to a petition for writ of certiorari—to avoid the restrictive standard of review associated with the writ:

> The primary consequence of a determination that a party must seek judicial review through the common law writ of certiorari procedure is that the trial court must apply a limited standard of review to decisions already made by administrative officials, rather than address the issue de novo as the initial decision maker.

> Under the limited standard of review in common law of writ of certiorari proceedings, courts review a lower tribunal's decision only to determine whether that decision maker exceeded its jurisdiction, followed an unlawful procedure, acted illegally, arbitrarily, or fraudulently, or acted without material evidence to support its decision.

*Moore & Assocs.*, 246 S.W.3d at 574 (citing cases); *see* Tenn. Code Ann. § 27-8-101; *see also Stewart*, 368 S.W.3d at 463; *421 Corp. v. Metro Gov't of Nashville and Davidson Cnty.*, 36 S.W.3d 469, 474 (Tenn. Ct. App. 2000).

original pleading, courts should look to the substance of the action."[41]  Id. at 581 (citing Johnson v. Metro. Gov't for Nashville Davidson Cnty., 54 S.W.3d 772, 774 (Tenn. Ct. App. 2001)); see also id. at 576 ("Regardless of the labels assigned to the complaint or the language of the requests for relief, the nature of Moore & Associates' claim is clear from its complaint.").

The legal principle referenced in Moore & Associates is longstanding in Tennessee.  In this Court's recent decision in Benz-Elliot v. Barrett Enters., L.P., the Court referred to it as the "oft-recited law in this State that to determine the governing statute of limitations, a court must ascertain the 'gravamen of the complaint.' " 456 S.W.3d 140, 147 (Tenn. 2015) (internal quotations omitted).  Benz-Elliot clarified that, for a complaint that contains multiple claims, courts must look to the gravamen of each claim, rather than to the gravamen of the entire complaint, to determine the statute of limitations applicable to a given claim.  Id. at 148-49, 51.  To determine the gravamen of a claim, it held, "a court must first consider the legal basis of the claim and then consider the type of injuries for which damages are sought."  Id. at 151.

The principle of determining the statute of limitations according to the gravamen of the claim has been applied by Tennessee courts in a number of contexts.  See, e.g., Dehoff v. Attorney Gen., 564 S.W.2d 361, 363-64 (Tenn. 1978) (determining that an action for declaratory judgment was untimely because in substance it was actually an election contest); Vance v. Schulder, 547 S.W.2d 927, 931 (Tenn. 1977) ("At various stages of this litigation, the parties have relied upon each of five (5) possible statutes of limitations . . . .  The applicable statute of limitations in a particular cause will be determined according to the gravamen of the complaint.").

Specifically, this reasoning has been applied to dismiss a declaratory judgment action where the gravamen of the complaint was a petition for writ of certiorari and it was filed outside the 60-day time limitation for such a petition.  For example, in Johnson v. Metropolitan Gov't for Nashville Davidson County, the plaintiff was terminated from his position as a registered nurse.  54 S.W.3d at 773.  The termination letter stated that the plaintiff's termination was done "in accordance with the Rules and Regulations of the Metropolitan Department of Hospitals," for which no administrative review was available.  Id.  The plaintiff filed an action for declaratory judgment in chancery court, seeking several declarations related to his allegedly wrongful termination.  Id.  The appellate court treated the complaint as a petition for writ of certiorari because "the only mechanism by which a court may review such administrative decisions" is a petition for writ of certiorari under section 27-9-101.  Id. at 774.  The complaint was filed well after

---

[41] The court ultimately dismissed the petition because the plaintiff had not exhausted its administrative remedies by first appealing to the zoning board.  *Moore & Assocs.*, 246 S.W.3d at 582.

the 60-day limit for a writ of certiorari, so the appellate court held that "the decision of the Hospital in dismissing [the plaintiff] was no longer reviewable" and dismissed the case. Id. at 774-75; see also Campbell v. Bedford Cnty. Reg'l Planning Comm'n, No. M2003-00025-COA-R3-CV, 2004 WL 626724, at *4-5 (Tenn. Ct. App. Mar. 29, 2004) (dismissing complaint for declaratory judgment because it was in substance a petition for a writ of certiorari and was filed well beyond the 60-day statute of limitations for seeking the writ); Kielbasa, 2003 WL 21297315, at *4-5 (same); see also Davidson v. Carr, 659 S.W.2d 361, 363 (Tenn. 1983) (stating that "[c]ommon law certiorari is available where the court reviews an administrative decision in which that agency is acting in a judicial or quasi-judicial capacity"); Case v. Shelby Cnty. Civil Serv. Merit Bd., 98 S.W.3d 167, 171 (Tenn. Ct. App. 2002) (stating that a common-law writ of certiorari "is available from administrative decisions where an administrative board or agency is acting in a judicial or quasi-judicial capacity"). But see Bean v. Wilson Cnty. School Sys., 488 S.W.3d 782, 789-90 (Tenn. Ct. App. 2015) (rejecting claim that decision of school administrators was reviewable by writ of certiorari because "[t]he entire certiorari scheme envisions a 'final order or judgment' before a board, commission, or officer exercising judicial or quasi-judicial authority, with a record of the hearing preserved for judicial review").

In light of these principles, we turn to the gravamen of Mr. McFarland's complaint. As noted above, the complaint is designated as an election contest, filed pursuant to the election contest statute, Section 2-17-101. The sole basis for the election contest is Mr. McFarland's allegation that Mr. Pemberton did not reside in the Ninth Judicial District one year prior to the election, which is constitutionally required for anyone who seeks to hold the office of circuit judge. In the first few pages of his complaint, Mr. McFarland details the facts upon which he bases his claim that Mr. Pemberton was a resident of Knox County during the year before the election. In paragraph 27 of the complaint, he alludes to the proceedings before the Election Commission: "Despite the fact that a qualified voter in Roane County, Tennessee, challenged Defendant Pemberton's qualifications as a legal resident in the Ninth Judicial District, Defendant Election Commission certified, without debate, Defendant as a candidate and allowed his name to be placed on the August 7, 2014 election ballot." In his prayer for relief, Mr. McFarland asks that the election be declared void, solely on the basis of Mr. Pemberton's alleged lack of residency in the Ninth Judicial District.

In contrast to Benz-Elliot, Mr. McFarland's complaint contains but one claim. It is apparent that the single claim in his complaint is premised on the same issue decided by the Election Commission in the pre-election hearing, namely, whether Mr. Pemberton lived in Knox County or Roane County during the requisite period prior to the election. He argues, in effect, that the Election Commission got it wrong. He seeks the same relief as would have been sought under a petition for writ of certiorari: constitutional disqualification of Mr. Pemberton for the office of circuit judge for the Ninth Judicial

District. Under Benz-Elliot, considering the legal basis of Mr. McFarland's claim and considering the type of injury for which he seeks relief, the gravamen of his claim is a petition for writ of certiorari, seeking judicial review of the Election Commission's decision.

As we have held, under section 27-9-101, Mr. McFarland was a party who was "aggrieved by [a] final order or judgment of" the Election Commission. He had standing to file a petition for writ of certiorari to obtain judicial review of the Commission's decision. Considering the gravamen of Mr. McFarland's complaint, the 60-day limitations period for a petition for writ of certiorari is the applicable statute of limitations. In other words, Mr. McFarland was required to file his action within sixty days of the Election Commission's decision. Because he did not file the complaint until well after that time period, it must be dismissed as untimely.

Our holding is based upon the peculiar facts in this case. It does not mean that Mr. McFarland was time-barred from filing an election contest based on any other ground. Further, had the issue of Mr. Pemberton's residency not been the subject of a quasi-judicial decision of the Election Commission, Mr. McFarland would not have been time-barred from challenging Mr. Pemberton's residency in an election contest. See Hatcher, 521 S.W.2d at 803 (holding that candidate can file an election contest challenging residency).

Justice Clark claims in her dissent that our ruling implicitly overrules Hatcher v. Bell. It does not. We readily acknowledge and "have no quarrel" with the Hatcher holding, namely, that "an election contest is a proper proceeding to test the validity of an election on the charge that the candidate receiving the highest number of votes cast in the election has not complied with the residence requirement set forth in the Constitution and was ineligible on the day of the election to hold the office; and that . . . [a] candidate in the election[] is a proper party to institute the proceeding." Hatcher, 521 S.W.2d at 803. The facts in Hatcher, however, did not include a prior administrative decision on the residency of the successful candidate in the election. The Court in Hatcher was not called upon to determine the applicable statute of limitations according to the gravamen of the petitioner's complaint. In contrast, our task in this case is to determine the applicable statute of limitations.

In numerous cases, Tennessee courts have been called upon to determine the gravamen of a complaint because, as one commentator noted, "[t]he gravamen dictates which statute of limitation controls." Donald F. Paine, Please Pass the Biscuits and Gravamen, Tenn. B.J., 20, 20 (1993); see also Benz-Elliott, 456 S.W.3d at 151 (citing Paine, 29 Tenn. B.J. at 20). Mr. McFarland is no different from any other claimant in this regard. Neither dissent offers any reason why the gravamen of Mr. McFarland's

complaint does not determine the statute of limitations applicable to his claim. Indeed, Justice Lee's dissent responds to our holding primarily by imagining a series of hypotheticals that purport to demonstrate that our decision will somehow encourage manipulation of the electoral process.[42] We must not, however, decide this case by conjuring up various scenarios that could result from one holding or another. Rather, we must base our decision on solid legal analysis and interpretation of the relevant statutes.

"It is well settled in this state that the gravamen of an action, rather than its designation . . . determines the applicable statute of limitations." Pera v. Kroger Co., 674 S.W.2d 715, 719 (Tenn. 1984). "[A] court must identify the gravamen of each claim alleged to determine the applicable statute of limitations. Identifying the gravamen of a claim requires a court to consider both the legal basis of the claim and the injury for which damages are sought." Benz-Elliott, 456 S.W.3d at 141. In this appeal, we apply established legal principles to the facts presented. No more, no less.

Under the facts of this case, the Election Commission decided the issue of Mr. Pemberton's residency in a quasi-judicial proceeding and rendered a final decision that was reviewable through a petition for common law writ of certiorari under section 27-9-101. Applying the legal principles enunciated in Benz-Elliot, the gravamen of Mr. McFarland's claim is a petition for judicial review of the Election Commission's decision, i.e., a petition for writ of certiorari. Because Mr. McFarland failed to file his complaint within the 60-day time limitation for filing a petition for writ of certiorari, this action is time-barred.

CONCLUSION

We hold that, by necessary implication, the Election Commission had the authority under Tennessee's Election Code to hold a quasi-judicial hearing to resolve Mr.

---

[42] The implication that our decision encourages manipulation of the electoral process is ironic indeed, given the allegations of manipulation against Mr. McFarland in this case. As outlined above, Mr. Hall and Mr. McFarland knew each other well at the time Mr. Hall filed his administrative complaint objecting to Mr. Pemberton's candidacy based on residency—Mr. Hall had been Mr. McFarland's client. This fact was one reason why Mr. McFarland "recused" himself from acting as county attorney in the Election Commission hearing at issue. Mr. Pemberton quite publicly accused Mr. McFarland of manipulating the process by enlisting a voter—Mr. Hall—to challenge Mr. Pemberton's residency. In this way, Mr. Pemberton claimed, Mr. McFarland got the Election Commission to resolve the issue of Mr. Pemberton's residency before the election while retaining the opportunity for a "second bite at the apple" in the form of a post-election contest. Gamesmanship in elections can arise in any statutory framework, and we are confident that our Legislature was aware of this possibility when it enacted the Election Code and chose to confer upon the Coordinator and the county election commissions the joint duty to place only qualified candidates on the ballot.

- 43 -

Hall's complaint challenging the Mr. Pemberton's residency and, thus, his eligibility to be placed on the ballot for Circuit Court Judge for the Ninth Judicial District. We hold that the Election Commission's decision to certify Mr. Pemberton as a qualified candidate on the ballot was a final administrative decision subject to judicial review by common-law writ of certiorari. Mr. McFarland, who had actual notice of the Election Commission hearing, was "aggrieved" by the Election Commission's final decision within the meaning of Tennessee Code Annotated section 27-9-101 and, therefore, had standing to file a petition for writ of certiorari. Looking at the gravamen of Mr. McFarland's complaint, though it is styled as an election contest, it is essentially a petition for writ of certiorari seeking judicial review of the decision of the Election Commission and, thus, was subject to the 60-day statute of limitations for such a petition. Mr. McFarland's complaint was filed well after expiration of the 60-day period, so we affirm the lower courts' dismissal of the complaint as untimely.

The decisions of the trial court and Court of Appeals are affirmed. Costs on appeal are to be taxed to Petitioner/Appellant William Thomas McFarland, for which execution may issue, if necessary.

_____
HOLLY KIRBY, JUSTICE